

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-7-2001

# Abdille v. Ashcroft

Precedential or Non-Precedential:

Docket 00-1659

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Abdille v. Ashcroft" (2001). *2001 Decisions.* Paper 42.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/42

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 7, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1659

MOHAMED ABDILLE, Petitioner

v.

JOHN ASHCROFT,* ATTORNEY GENERAL OF TH E
UNITED STATES, Respondent

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A 77 007 398)

Argued: December 18, 2000

Before: BECKER, Chief Judge, NYGAARD and
FUENTES, Circuit Judges.

(Filed March 7, 2001)

>        OLGA NARYMSKY, ESQUIRE
>          (ARGUED)
>        Hebrew Immigrant Aid Society
>        333 Seventh Avenue
>        New York, NY 10001
>
>        AMY GOTTLIEB, ESQUIRE
>        American Friends Service Committee
>        972 Broad Street, 6th Floor
>        Newark, NJ 07102
>
>        Counsel for Petitioner

_____

* Substituted for Janet Reno pursuant to Federal Rule of Appellate
Procedure 43(c).

DAVID W. OGDEN, ESQUIRE
Assistant Attorney General
RICHARD M. EVANS, ESQUIRE
Assistant Director
PAUL FIORINO, ESQUIRE (ARGUED)
MICHAEL P. LINDEMANN, ESQUIRE
ALISON M. IGOE, ESQUIRE
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

Counsel for Respondent

OPINION OF THE COURT

BECKER, Chief Judge.

Mohamed Jama Abdille, a Somali native, petitions for a review of a Board of Immigration Appeals (BIA or Board) decision that: (1) denied him asylum from Somalia on the ground that he had firmly resettled in South Africa; and (2) denied him asylum from South Africa on the gr ound that he failed to establish past persecution or a well-founded fear of persecution in that country. Abdille's Petition for Review requires us to interpret for the first time the meaning of the "firm resettlement" bar to asylum now codified in the Immigration and Nationality Act (INA), and further defined in S 208.15 of Title 8 of the Code of Federal Regulations. This statutory bar, as fleshed out in the applicable immigration regulations, precludes the Attorney General from granting asylum to an applicant when the Attorney General finds that the applicant had firmly resettled in a third country prior to his arrival in the United States.

We conclude that the plain language of S 208.15 makes clear that the prime factor in the firm r esettlement inquiry is the existence of an offer of permanent resident status, citizenship, or some other type of permanent r esettlement. While recognizing that factors other than the issuance of such an offer may prove relevant to the firm resettlement

2

question, we reject an alternative "totality of the alien's circumstances" approach that would have us consider the existence of an offer as simply one component of a broader firm resettlement inquiry accor ding equal weight to such non-offer-based factors as the alien's length of stay in a third country, the economic and social ties that the alien develops in that country, and the alien's intent to make that country his permanent home.

In light of this conclusion, we find that the BIA's discussion of Abdille's firm resettlement in South Africa is inadequate with regard to whether Abdille received an offer of some type of permanent resettlement, and that proper resolution of the firm resettlement issue requires additional information concerning the content of South African immigration law and practice. Because of the limited nature of the record before us on appeal, and because of the considerable deference we owe to the Immigration and Naturalization Service (INS) when it makes factual determinations (and the content of for eign law is a matter for fact finding), we will grant the Petition for Review and remand the case to the BIA for: (1) further investigation into the content of South African immigration law and practice; and (2) appropriate resolution of the question whether Abdille received an offer of some type of permanent resettlement from the South African gover nment.

One critical element in the resolution of thefirm resettlement question is the determination of whether Abdille or the government will bear the bur den of establishing the content of South African law, an issue on which the parties disagree. To give guidance to the BIA and to expedite the resolution of this matter , thereby avoiding another Petition for Review, we address this issue and opine that the INS, as the party initially seeking to rely on foreign law, will carry the initial bur den, but that once the INS introduces evidence sufficient to indicate that the firm resettlement bar will apply, the burden of proving relevant provisions of South African law will shift to Abdille. Finally, we hold that the BIA's conclusion that Abdille failed to make the requisite showing of past persecution or a well-founded fear of persecution necessary for eligibility for asylum from South Africa must stand.

3

I. Facts and Procedural History[1]

Abdille was born in Somalia in 1967, and was orphaned at an extremely early age. He never lear ned the identity of his parents and hence could not trace his clan lineage. According to an affidavit submitted by Said S. Samatar, Professor of African History at Rutgers University, clan lineage is a central feature of social and political life in Somalia, and an individual's inability to identify himself with a particular clan can be a substantial, per haps life-threatening, impediment. Such dangers wer e exacerbated by the fall of General Siyaad Barre in 1991, after which central government in Somalia collapsed, and militias, splintered along clan lines, filled the power vacuum. Clanlessness is rare in Somalia, and an individual who is unable to trace his lineage, such as Abdille, is often suspected of hiding his true affiliation and pr esumed to be a member of a rival clan.

Prior to General Barre's fall, Abdille led an apparently ordinary and undisturbed existence in Somalia, employed as an electrician for Somali National Power in the city of Mogadishu. After 1991, however, events took a dramatic turn for the worse: Abdille lost his job, and his lack of clan identity led to repeated confrontations, detentions, and physical assaults at the hands of suspicious militia members.[2] Ultimately, in Mar ch 1998, Abdille fled Somalia

_____

1. The basic facts concerning Abdille's life in Somalia and South Africa, as well as the circumstances leading up to his application for asylum in the United States, are not in dispute. Our r ecitation of these facts, particularly with regard to events in Somalia and South Africa, is drawn principally from Abdille's affidavit in support of his petition for asylum, and a transcript of Abdille's oral testimony befor e the Immigration Judge (IJ), both of which are contained in the Certified Administrative Record. The IJ specifically found Abdille's testimony to be credible.

2. Abdille's affidavit and oral testimony depict these events in much greater detail. For instance, during one detention, Abdille was subjected to a mock execution. On another occasion, militia members tied Abdille's hands and feet, repeatedly beat him with sticks, and stabbed his arm and chest with a bayonet. As part of his application for asylum, Abdille submitted a report prepared by Dr . Nina Regevik, who conducted a physical examination of Abdille and concluded that Abdille's scars were consistent with a history of beatings and stabbings.

4

in a small boat, arrived in Mozambique, and then traveled on foot to South Africa, entering the latter country in April 1998. We do not believe it necessary her e to canvass the events in Somalia in a more extensive fashion, as the parties do not dispute that Abdille satisfied his burden in establishing past persecution or a well-founded fear of persecution in Somalia, and that, absent application of the firm resettlement bar, Abdille would be eligible for asylum from that country. Abdille's Petition for Review focuses our attention on the events that transpired in South Africa.

The South African government, acting pursuant to its Aliens Control Act of 1991, granted asylum to Abdille on or around June 25, 1998. Abdille's asylum documents show that such status had a duration of two years, commencing on June 25, 1998 and expiring on June 24, 2000. According to a letter from South Africa's Department of Home Affairs to Abdille, at the end of that two-year period Abdille would have to contact the Department for a "reviewal of [his] refugee status or to otherwise legalise [his] continued stay in" South Africa; otherwise, Abdille would be in the country illegally, and therefore would be subject to potential prosecution under the Aliens Contr ol Act. Abdille was also issued a South African passport, which he eventually used to enter the United States, and a travel document allowing him re-entry into South Africa.

Abdille lived in Cape Town, South Africa, fr om April 1998 through January 1999, in a rented gr oup home he shared with fourteen other Somali natives. Unable to obtain the necessary certification to pursue his previous career as an electrician, Abdille worked as a street vendor selling cigarettes, candy, and other miscellaneous items. While working as a street vendor, Abdille suf fered two separate attacks by two different groups of South Africans. First, in July 1998, as he was selling his merchandise in a public market, Abdille was approached by a group of five or six young South African men. The men hit Abdille, knocking him unconscious with a blow to the back of the head, and stole his merchandise. Abdille suffer ed facial injuries and lost several teeth. The other vendors in the market did not intervene. Following the attack, Abdille reported the incident to the police. Abdille told the officers that he could

5

identify the assailants, but he testified in pr oceedings before the Immigration Judge (IJ) that the police did nothing in response except inform him that he should return to the station at a later time.

The second incident occurred five months later, in December 1998, when a separate group of men attacked Abdille as he was selling his wares in a dif ferent market. The men stole all of Abdille's merchandise, but Abdille ran away before he could be physically injur ed. [A.R. 131]. Again, Abdille reported the attack to the police, but was told to return the next day. Following the December attack, Abdille decided to leave South Africa and moved to Johannesburg in order to make preparations for departure. He remained in Johannesburg for thr ee weeks, leaving in February 1999. Abdille ultimately arrived in the United States on April 8, 1999, via Brazil and Chile.

Upon his arrival, Abdille surrendered to INS officials. On May 19, 1999, INS issued an Order to Show Cause, charging Abdille with removability under 8 U.S.C. S 1182(a)(7)(A)(i)(I), as an immigrant not in possession of a valid immigrant visa or entry document, and 8 U.S.C. S 1182(a)(7)(A)(i)(II), as an immigrant in possession of a visa not properly issued. Abdille sought asylum and withholding of removal relief both from Somalia and from South Africa. The IJ denied Abdille's asylum request with r espect to Somalia, on the ground that he had fir mly resettled in South Africa, and denied his asylum request with respect to South Africa, on the ground that he had failed to demonstrate persecution or a well-founded fear of persecution.3 Abdille appealed, but the BIA similarly denied his requests for asylum from both Somalia and South Africa, for the reasons relied upon by the IJ. Abdille now brings a Petition for Review contesting the BIA's decision. Because Abdille's removal proceedings wer e commenced

_____

3. The IJ also denied Abdille's request for withholding of removal to South Africa, and granted his request for withholding of removal to Somalia. Abdille did not appeal the IJ's withholding of removal decisions to the BIA, and does not seek review of those decisions on this appeal. Accordingly, we need not concern ourselves with the question whether Abdille was eligible for withholding of removal relief.

after April 1, 1997, we have jurisdiction pursuant to 8 U.S.C. S 1252(a)(1).

II. General Asylum Standards

The federal asylum statute confers discretion on the Attorney General to grant asylum to an alien applicant "if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A)." 8 U.S.C. S 1158(b)(1). Section 1101(a)(42)(A) defines "refugee" as

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. S 1101(a)(42)(A). The asylum applicant bears the burden of establishing that he or she falls within this statutory definition of "refugee." See 8 C.F.R. S 208.13(a) (2000); see also Balasubramanrim v. INS, 143 F.3d 157, 161 (3d Cir. 1998).

Section 1158(b)(2) lists several exceptions pr oscribing the Attorney General from exercising his discretion to grant asylum, including the exception pertinent to this appeal, added to the federal asylum statute by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA): Section 1158(b)(2)(A)(vi) bars the grant of asylum to an alien "firmly resettled in another country prior to arriving in the United States." 8 U.S.C. S 1158(b)(2)(A)(vi); see also 8 C.F.R. S 208.13(c)(1) (2000) ("For applications filed on or after April 1, 1997, an applicant shall not qualify for asylum if section . . . 208(b)(2) of the Act[8 U.S.C. S 1158(b)(2)] applies to the applicant.").4

(Text continued on page 9)

_____

4. The compulsory language of the statute and r egulations makes clear that a finding of firm resettlement is currently a mandatory bar to the

7

grant of asylum. However, a brief survey of the evolution of the firm resettlement bar reveals that this was not always the case. The concept of "firm resettlement" was first introduced into U.S. immigration law in the Displaced Persons Act of 1948, ch. 647, 62 Stat. 1009, which used the concept of firm resettlement in the definition of "displaced person," and the Refugee Relief Act of 1953, Pub. L. No. 83-203, 67 Stat. 400, which expressly included the phrase "fir mly resettled" in the definition of
"refugee," as a limitation on the persons eligible for such status. See Rosenberg v. Yee Chien Woo, 402 U.S. 49, 53-54 & n.3 (1971). When the Refugee Relief Act was extended in 1957, however , the "firmly resettled" language was dropped from the "r efugee" definition, and was not re-inserted in subsequent statutory revisions to U.S. refugee laws until the IIRIRA in 1996 codified the firm r esettlement bar. See 8 U.S.C.
S 1158(b)(2)(A)(vi).

The present firm resettlement bar re-emerged in the Supreme Court's 1971 decision in Yee Chien Woo, a case involving a native of mainland China, who fled that country in 1953, arrived in the United States in 1960, and eventually applied for an immigrant visa claiming a "preference" under S 203(a)(7) of the Immigration and Nationality Act of 1952, as an alien who fled a Communist country fearing persecution on account of race, religion, or political opinion. See 402 U.S. at 50-51, 53.
In the seven years prior to his arrival in the U.S., Yee Chien Woo had lived and worked in Hong Kong. See id. at 50. The INS used Yee Chien Woo's residence and work in Hong Kong as a ground for denying his application, but the Court of Appeals for the Ninth Circuit determined that the INS's reliance on the alien's fir m resettlement was erroneous. See id. at 51-52. Pointing to the fact that Congress had omitted the phrase "firmly resettled" from statutory definitions of "refugee" after 1957, the Ninth Circuit concluded that Y ee Chien Woo's firm resettlement in Hong Kong was irrelevant to the issue whether his immigration application should be granted underS 203(a)(7). See id. The Supreme Court, however, unambiguously r ejected the Ninth Circuit's approach: "In short, we hold that the `r esettlement' concept is not irrelevant. It is one of the factors which the Immigration and Naturalization Service must take into account to determine whether a refugee seeks asylum in this country as a consequence of his flight to avoid persecution." Id. at 56.

As the quoted language above demonstrates, following Yee Chien Woo, "firm resettlement" was not a mandatory bar to asylum eligibility, but rather one of the factors the INS was to weigh in exercising its discretion
as to the grant of an alien's asylum application. See, e.g., Farbakhsh v. INS, 20 F.3d 877, 881 (8th Cir. 1994) (canvassing briefly the history of

8

"Firm resettlement," "persecution," and "well-founded fear of persecution" are all findings of fact that we review under the deferential substantial evidence standar d articulated in INS v. Elias-Zacarias, 502 U.S. 478 (1992)."Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Senathirajah v. INS , 157 F.3d 210, 216 (3d Cir. 1998) (internal quotation marks and citation omitted). Under the substantial evidence standar d, the BIA's finding must be upheld unless the evidence not only supports a contrary conclusion, but compels it. See Elias-Zacarias, 502 U.S. at 481 & n.1; Chang v. INS, 119 F.3d 1055, 1060 (3d Cir. 1997) ("On questions of fact, we will reverse the BIA's determination that[an applicant] is not eligible for asylum . . . only if a reasonable fact-finder would have to conclude that the requisite fear of persecution existed.") (emphasis added).

## III. The Firm Resettlement Inquiry

The BIA denied Abdille asylum from Somalia based on a finding of firm resettlement in South Africa. As mentioned

---

the firm resettlement bar). Prior to 1990, INS regulations prohibited district directors from granting asylum to aliens who had firmly resettled in a third country, see 8 C.F.R.S 208.8(f)(1)(ii) (1988), but the BIA interpreted that regulation as not applying either to immigration judges or to the Board itself. See Matter of Soleimani, 20 I. & N. Dec. 99, 104 (BIA 1989). Accordingly, for immigration judges and the BIA, firm resettlement was a factor used to guide their discretion in determining whether to grant asylum. See 3 Charles Gor don et al., Immigration Law & Procedure S 33.04[1][e][iii], at 33-52.9 (2000). The BIA did, however, also rule that firm resettlement would ordinarily preclude an asylum grant unless the alien could demonstrate compelling countervailing equities in his or her favor. See Soleimani, 20 I. & N. at 105.

Effective October 1, 1990, the INS amended its regulations concerning firm resettlement, providing for a mandatory denial of asylum upon a finding of firm resettlement. See 8 C.F.R. S 208.14(c)(2) (1991);see also 8 C.F.R. S 202.13(c)(2)(i)(B) (2000) (stating that for asylum applications filed before April 1, 1997, an immigration or asylum officer shall not grant asylum to any alien who "[h]as beenfirmly resettled."). As noted above, Congress in 1996 codified this mandatory bar in the federal asylum statute at 8 U.S.C. S 1158(b)(2)(A)(vi).

9

above, the firm resettlement bar applicable in Abdille's case is codified in the INA at 8 U.S.C. S 1158(b)(2)(A)(vi), and referenced in the INS's regulations at 8 C.F.R. S 208.13(c)(1).5 The INA does not furnish a definition of "firm resettlement," but federal regulations do, and that definition becomes vital to our analysis in the instant matter. Specifically, 8 C.F.R. S 208.15, captioned "Definition of `firm resettlement,' " provides the following:

> An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she enter ed into another nation with, or while in that nation r eceived, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes:
>
> (a) That his or her entry into that nation was a necessary consequence of his or her flight fr om persecution, that he or she remained in that nation only as long as was necessary to arrange onwar d travel, and that he or she did not establish significant ties in that nation; or
>
> (b) That the conditions of his or her residence in that nation were so substantially and consciously r estricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the Asylum Officer or Immigration Judge shall consider the conditions under which other residents of the country live, the type of housing made available to the refugee, whether permanent or temporary, the types and extent of employment available to the refugee, and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation including a right of entry or r eentry,

_____

5. In their briefs, both Abdille and the INS err oneously assume that 8 C.F.R. S 208.13(c)(2) contains the relevant firm resettlement bar. However, by its terms, this provision applies only to an alien "who filed his or her application before April 1, 1997." 8 C.F.R. S 208.13(c)(2)(i) (2000) (emphasis added). Abdille did not arrive in the United States until April 8, 1999, and his asylum application is dated July 23, 1999.

10

> education, public relief, or naturalization, or dinarily
> available to others resident in the country.

8 C.F.R. S 208.15 (2000) (emphasis added). It is the BIA's
application of this provision that is at issue.

The BIA's reliance on the firm r esettlement bar as its
basis for denying Abdille asylum from Somalia r equires us
to consider the factors that inform a finding of firm
resettlement. Our analysis, of course, is constrained by the
great deference we owe to the INS in immigration matters,
particularly when the agency interprets and applies its own
regulations. See, e.g., INS v. Aguirr e-Aguirre, 526 U.S. 415,
424-25 (1999) (holding that Chevron deference, typically
triggered when an agency construes a statute it is charged
with administering, is appropriate in the immigration
context because of the INA's express delegation of authority
to the Attorney General); Applebaum v. Nissan Motor
Acceptance Corp., 226 F.3d 214, 218 n.4 (3d Cir. 2000)
(noting that when an agency is interpreting its own
regulation, rather than a statute it administers, review is
under the Bowles v. Seminole Rock & Sand Co., 325 U.S.
410 (1945), standard, which renders the agency's
interpretation controlling "unless it is plainly erroneous or
inconsistent with the regulation," id.  at 414).

Our principal guide in this endeavor is the language and
structure of 8 C.F.R. S 208.15, the INS's own definition of
firm resettlement. It is readily evident from the plain
language of S 208.15 that the prime element in the firm
resettlement inquiry is the existence vel non of "an offer of
permanent resident status, citizenship, or some other type
of permanent resettlement." 8 C.F .R. S 208.15 (2000). Thus,
on its face, S 208.15 explicitly centers thefirm resettlement
analysis on the question whether a third country issued to
the alien an offer of some type of official status permitting
the alien to reside in that country on a per manent basis.

The alternative approach would have us consider the
existence of a government-issued offer as simply one
component of a broader firm resettlement inquiry according
equal weight to such non-offer-based factors as the alien's
length of stay in a third country, the economic and social
ties that the alien develops in that country, and the alien's

11

intent to make that country his permanent home. Under such an approach, the IJ and BIA would consider both the formal issuance of an offer and the existence of various non-offer-based factors together , as part of the total mix of information bearing on the firm r esettlement question, and, after weighing these elements as a whole, would arrive at a conclusion regarding the applicant's fir m resettlement in the third country.

Such a "totality of the alien's circumstances"-type of calculus is suggested by Chinese American Civil Council v. Attorney General, 566 F.2d 321 (D.C. Cir. 1977), in which the Court of Appeals for the D.C. Circuit found that Chinese aliens who had lived in Hong Kong for at least fifteen years following their flight from mainland China had firmly resettled in Hong Kong. See id. at 326. In reaching this conclusion and in elaborating on the fir m resettlement inquiry, the D.C. Circuit relied principally on non-offer-based elements, noting that the time elapsed between an alien's flight from a country of persecution and his application for asylum in the U.S. is an important factor in determining whether an alien had fir mly resettled in a third country, see id. at 328 & n.18, and further stating that "[a]n applicant's family ties, intent, business or property connections and other matters may be relevant to resettlement determinations." Id.  at 328 n.18. The court made no mention of whether the government of Hong Kong had extended to the aliens an offer of per manent resident status, citizenship, or some other type of per manent resettlement.

Although not expressly labeling it as such, other courts of appeals also appear to have employed a "totality of the alien's circumstances" approach in thefirm resettlement context. For example, in Farbakhsh v. INS, 20 F.3d 877 (8th Cir. 1994), the Court of Appeals for the Eighth Circuit upheld a BIA decision denying an Iranian national eligibility for asylum in the United States based on the applicant's resettlement in Spain. In concluding that the BIA's finding of firm resettlement was supported by the record, the court relied on several non-offer-based elements, such as the fact that the applicant "had lived more than four years in Spain without fear of being returned to Iran"; that "he initially

12

intended to remain in Spain"; and that "his younger brother and younger sister were living in Spain." Id. at 882. As in Chinese American, no explicit mention of the for mal issuance of an offer of permanent r esettlement was made. In a similar vein, the Court of Appeals for the Fourth Circuit appeared to follow a "totality" approach in Mussie v. INS, 172 F.3d 329 (4th Cir. 1999), deciding that an Ethiopian citizen had firmly resettled in Germany because she received asylum status and travel documentation from the German government, and "[i]n addition, she lived in Germany for six years, during which time she r eceived government assistance for language schooling, transportation, rent, and food; held a job; paid taxes; and rented her own apartment." Id. at 331–32.

We believe, however, that the plain language of the INS's own definition of firm resettlement counsels against such a broad, "totality of the alien's circumstances" analytical framework. Section 208.15 clearly states that a prima facie case of firm resettlement is established once the evidence shows that the asylum applicant received "an offer of permanent resident status, citizenship, or some other type of permanent resettlement" in a thir d country. 8 C.F.R. S 208.15 (2000). Although S 208.15 expr essly enumerates certain non–offer–based elements, such as "the type of housing made available to the refugee, . . . the types and extent of employment available to the refugee, and the extent to which the refugee received per mission to hold property," id. S 208.15(b), it prompts the IJ to consider such factors only in determining whether one of the two exceptions to the firm resettlement bar provided for in S 208.15 applies; it does not list these elements in connection with the prima facie showing of fir m resettlement.6

_____

6. For example, S 208.15(a), which per mits an alien to rebut the prima facie showing of firm resettlement by demonstrating that "he or she remained in that nation only as long as was necessary to arrange onward travel," authorizes the alien to set forth evidence that "he or she did not establish significant ties in that nation." 8 C.F.R. S 208.15(a) (2000) (emphasis added). Similarly, S 208.15(b), which allows an alien to make this rebuttal showing by establishing"[t]hat the conditions of his or her residence in that nation were . . . substantially and consciously restricted by the authority of the country of r efuge," expressly mandates

13

Thus, by its terms, this regulatory pr ovision focuses the firm resettlement analysis on the existence vel non of a formal government-issued offer .

We are not the first court to r ecognize the prime relevance for firm resettlement purposes of a government's offer of some type of permanent r esettlement: the Court of Appeals for the Tenth Circuit followed a complementary analysis in Abdalla v. INS, 43 F.3d 1397 (10th Cir. 1994). In Abdalla, the court considered the case of a Sudanese native who was found by the BIA to have fir mly resettled in the United Arab Emirates (UAE) prior to his arrival in the United States. See id. at 1398. The court upheld the BIA's conclusion, focusing principally on the fact that the alien had lived for twenty years in the UAE under a "r esidence permit" issued by the UAE government. See id. at 1399. In effect, the Abdalla court treated the residence permit, which had apparently conferred on the alien a legal right to live and work in the UAE for two decades, as dir ect evidence of a government-issued offer of permanent resettlement. Importantly, the court went on to note that this permit, viewed in light of the applicant's twenty-year stay in the UAE, "was sufficient to suggest per manent resident status, citizenship or some other per manent resettlement." Id. at 1399 (inter nal quotation marks and citations omitted). The court ended its fir m resettlement analysis by shifting the burden to the alien"to prove that his extended, officially sanctioned stay in [the UAE] did not constitute a firm resettlement in the UAE." Id. at 1399 (emphasis added). It ultimately concluded that the alien did not meet this burden in part because other , non-offer-based factors, such as the alien's significant family ties to the UAE, militated in favor of a firm r esettlement finding. See id. at 1400.

_____

that an immigration judge, in evaluating the alien's evidentiary presentation, consider factors such as "the type of housing made available to the refugee, . . . the types and extent of employment available to the refugee, and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges . . . ordinarily available to others resident in the country." 8 C.F.R. S 208.15(b) (2000).

14

We acknowledge that circumstances may arise in which the INS may not be able to secure direct evidence of a formal government offer of some type of permanent resettlement, and thus may be not be able to make the prima facie showing of firm resettlement under S 208.15 in that manner. In such a situation, the IJ or BIA may find it necessary to rely on non-offer-based factors, such as the length of an alien's stay in a third country, the alien's intent to remain in the country, and the extent of the social and economic ties developed by the alien, as cir cumstantial evidence of the existence of a government-issued offer. As we see it, if direct evidence of an offer is unobtainable, such non-offer-based elements can serve as a surrogate for direct evidence of a formal offer of some type of permanent resettlement, if they rise to a sufficient level of clarity and force, which we need not here delineate. 7 The Court of Appeals for the Ninth Circuit faced such a situation in Cheo v. INS, 162 F.3d 1227 (9th Cir. 1998), as described in the margin.8 See also Andriasian v. INS, 180 F.3d 1033, 1043

_____

7. In the instant matter, the INS has adduced some direct evidence that Abdille received an offer of some type of resettlement from the South African government. See infra Section IV.A. The INS also points to certain non-offer-based factors, especially Abdille's employment as a street vendor and his opportunity to work as an electrician in South Africa, to bolster its contention that Abdille hadfirmly resettled in that country. See infra note 9. However, because we reject a "totality of the alien's circumstances" approach to thefirm resettlement inquiry, and because the INS has presented direct evidence of a South African government-issued offer (on which it primarily relied in arguing that Abdille had received an offer of some type of permanent resettlement within the meaning of 8 C.F.R. S 208.15), we need not address whether such factors can serve as circumstantial evidence of a government-issued offer.

8. In Cheo, two Cambodian nationals, Meng Ly Cheo and Meng Heng Cheo, sought refuge from their native land, but had lived for three years in Malaysia prior to their entry into the United States. See 162 F.3d at 1228. In conducting its firm resettlement inquiry, the Ninth Circuit first noted that "there is no direct evidence one way or the other as to whether the Cheos have or had the right to r eturn to Malaysia," id. at 1229, and therefore no evidence as to whether they had received an offer of permanent resettlement from the government of that country. In such a circumstance, the court contemplated the use of non-offer-based factors as a substitute for the existence of an of fer as prima facie

15

(9th Cir. 1999) ("In the absence of dir ect evidence of an offer, a lengthy, undisturbed r esidence in a third country may establish a rebuttable presumption that an individual has the right to return to that country and remain there permanently."); Mussie v. INS, 172 F.3d 329, 332 (4th Cir. 1999) (citing with approval Cheo's pr esumption based on the length of the alien's stay).

Finally, we note that the emphasis that S 208.15's firm resettlement calculus places on the existence of a formal government offer of some type of per manent resettlement is in keeping with a principal facet of immigration law: A nation has broad authority to regulate the terms and conditions under which an individual can be admitted within its borders, and under which he can seek to establish a residence therein. See Miller v. Albright, 523 U.S. 420, 453 (1998) (Scalia, J., concurring); Rogers v. Bellei, 401 U.S. 815, 830-31 (1971). Absent some government dispensation, an immigrant who surr eptitiously enters a nation without its authorization cannot obtain official resident status no matter his length of stay, his intent, or the extent of the familial and economic connections he develops. Citizenship or permanent residency cannot be gained through adverse possession. With this understanding of the factors under girding the firm resettlement inquiry in mind, we turn to the BIA's decision in the instant matter.

_____

evidence of firm resettlement. Specifically, the court fashioned a rebuttable presumption of firm r esettlement based on the aliens' length of stay:

> Three years of peaceful residence established that the ground of `firm resettlement' in Malaysia might apply . . . . That was enough time so that, in the absence of evidence to the contrary, it would be a reasonable inference from the duration that Malaysia allowed the Cheos to stay indefinitely.

Id.

IV. Abdille's Firm Resettlement in South Africa

A.

It appears that the BIA, in reaching the conclusion that
the firm resettlement bar precluded the INS from granting
Abdille asylum from Somalia, relied in part on what it
considered to be an offer made by the South African
government to Abdille of some type of per manent
resettlement. In seeking to make its prima facie showing of
firm resettlement, the INS intr oduced evidence of two South
African government documents approving Abdille's
application for asylum in that country, both contained in
the Certified Administrative Record. Thefirst record is a
Certificate of Exemption entitling Abdille to asylum under
South Africa's Aliens Control Act of 1991 for a two-year
period of exemption commencing on June 25, 1998 and
ending on June 24, 2000. The second is a letter fr om South
Africa's Department of Home Affairs addr essed to Abdille
discussing Abdille's obligations at the conclusion of this
two-year refugee period:

> Please note, however, that if at the end of the period of
> exemption [i.e., June 24, 2000], you do not wish to
> leave [South Africa], the onus rests on you to contact
> the Department for the review of your r efugee status
> or to otherwise legalise your continued stay in[South
> Africa] before the expiry date of your Certificate. Failure
> to do so may render you liable to prosecution in terms
> of the provisions of the Aliens Control Act, 1991 (Act
> 96 of 1991).

Although the BIA acknowledged that the Certificate of
Exemption conferring refugee status on Abdille would
expire after a two-year term, it nonetheless concluded that
the issuance of this certificate repr esented an offer of some
type of permanent resettlement within the meaning of 8
C.F.R. S 208.15's firm r esettlement definition because,
according to the BIA's reading of the Department of Home
Affairs letter, Abdille's refugee status "does not simply
terminate" at the end of the two-year exemption period.
Looking at those two documents, the BIA deter mined that

17

the firm resettlement bar applied to Abdille, requiring the INS to deny Abdille's asylum application.9

We cannot say, however, that the two documents describing Abdille's refugee status under South African law constitute substantial evidence supporting the conclusion that the government of South Africa granted Abdille an offer of some other type of permanent resettlement. If anything, these records compel the contrary conclusion--i.e., that such an offer of resettlement was, by its terms, only temporary in nature. As is evident from the face of the Certificate of Exemption, South Africa's of fer to Abdille of asylum status (and Abdille's acceptance of that of fer) carried with it an explicit termination date: Abdille's legal right to reside in South Africa as a refugee exempt from certain provisions of the Aliens Control Act of 1991 would end on June 24, 2000. Furthermore, the Department of Home Affairs letter to Abdille makes clear that, absent further action on Abdille's part, he would be subject to prosecution under South African law should he choose to remain in South Africa after the expiration of the two-year exemption period on June 24, 2000. Given this plain language, we are hard-pressed to see how these documents lend support to the BIA's conclusion that Abdille's refugee status "does not simply terminate" on June 24, 2000, and was in fact of a more permanent natur e.

We acknowledge, however, that we lack familiarity with the intricacies of South African immigration law. While the

_____

9. The BIA's opinion mentions other non-of fer-based factors such as the fact that Abdille was issued a travel document granting him the right to re-enter South Africa after trips abroad; had the opportunity and ability to rent a private home in Cape Town; and had the opportunity to work as an electrician if certified. However, fr om the language of the BIA's decision, it does not appear that the BIA employed these factors in connection with its determination that Abdille had received an offer of some other type of permanent resettlement from South Africa. Rather, the BIA's opinion demonstrates that it employed these factors to conclude that South Africa did not substantially and consciously restrict the conditions of Abdille's residence, and thus to reject Abdille's attempt to rely on the firm resettlement exception contained in S 208.15(b). On appeal, Abdille does not challenge the BIA's finding with regard to that exception.

18

information contained in the Certificate of Exemption and the Department of Home Affairs letter to Abdille strongly suggests that the grant of refugee status for afixed term of two years is something short of an offer of some other type of permanent resettlement, it may be true that under the relevant provisions of South African immigration law, or the application of that law in practice, a refugee's two-year exemption period will often mature into a mor e permanent status. For instance, it may be that provisions of the Aliens Control Act ease the burden on an alien applying for official permanent resident status if that alien has already received asylum, or that, as a matter of immigration practice, two-year refugees like Abdille routinely r eceive a form of permanent status if they apply for such status prior to the expiration of the two-year exemption period. The Certified Administrative Record is completely silent on these points, however, and at this stage, in the absence of further evidence, reliance on these contingencies would amount to nothing more than mere speculation.

The BIA's decision in Matter of D-L- & A-M-, 20 I. & N. Dec. 409 (BIA 1991), is instructive in this r egard. In D-L- & A-M-, the BIA found that two Cuban natives seeking asylum from that country had firmly resettled in Spain, where they had spent six years prior to their entry into the United States. See id. at 414. In reaching this conclusion, the Board appropriately focused on the Spanish government's official recognition of the aliens' legal right to reside in that country. Specifically, the BIA noted that the aliens had received official temporary resident status that was renewable each year, and, importantly, that this temporary residency could be converted to permanent residency once one of the aliens obtained a work contract. See id. at 411, 414. This latter point was established through the cross-examination testimony of one of the aliens in hearings before the INS. See id. at 411. In the instant matter, the proceedings on remand may very well yield similar evidence of the likelihood that Abdille's fixed, two-year r efugee term in South Africa will be converted into a mor e permanent status.

19

B.

As the foregoing discussion demonstrates, pr oper resolution of the firm resettlement issue requires further information as to the content of South African immigration law and practice. Given the limited nature of the record before us on appeal, and the considerable defer ence we owe to the INS in immigration matters, we believe it improper for us to settle the firm resettlement question based on our hypotheses regarding the type of contingencies that could have occurred at the end of Abdille's two-year exemption period under the terms of the Aliens Contr ol Act or its practical applications.10 Accor dingly, we consider it necessary to grant Abdille's Petition for Review and to remand, so that the BIA may further investigate the content of South African immigration law and practice in general, and may resolve the specific question whether , under South African refugee law and practice, the issuance of a Certificate of Exemption granting an alien r efugee status for

_____

10. Moreover, we do not believe that the circumstances are appropriate for us to take judicial notice of the content of South African law on this appeal. In general, foreign law is treated as a fact that must be proven by the parties. See, e.g., Black Diamond Steamship Corp. v. Robert Stewart & Sons, 336 U.S. 386, 397 (1949) ("[T]he Court has adhered to the general principle that foreign law is to be proved as a fact."); Intercontinental Trading Co., Inc. v. M/V Zenit Sun, 684 F. Supp. 861, 864 (E.D. Pa. 1988) ("No proof having been presented at trial as to Chilean law, the court cannot take judicial notice of the law of Chile . . . ."). Although federal courts have discr etionary authority to judicially
notice the laws of foreign countries pursuant to the fact-finding procedure contained in Fed. R. Civ. Pr o. 44.1, see 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence S 201.52[3][b], at 201-94 (Joseph M. McLaughlin ed., 2d ed. 2000); see also Sidali v. INS, 107 F.3d 191, 197 n.9 (3d Cir. 1997), because such a procedure was not followed in the instant matter, we will r efrain from judicially noticing the
content of South African refugee law.

We did conduct a preliminary investigation into South African law, to see whether an issue existed with respect to the consequences that Abdille would experience under South African immigration law and practice upon the expiration of his two-year r efugee period. The information we obtained suggested that such an issue did exist, and we therefore concluded that remand to the BIA was the appropriate avenue for resolution of that issue. We did not use the information we gathered except in this preliminary fashion, and, as noted above, we decline to judicially notice it.

20

a fixed two-year term amounted to an of fer of some other type of permanent resettlement within the meaning of S 208.15. On remand, both Abdille and the INS should be afforded an opportunity to supplement the record by presenting evidence bearing on these issues. Of course, we express no opinion as to the proper r esolution of the question whether Abdille had firmly r esettled in South Africa.11

V. The Burden of Proof as to the Content of South African Law

Because the substance of South African immigration law will prove highly relevant to the final disposition of the firm resettlement issue, and in the interest of providing some further guidance on remand, we need to consider the issue of which party--Abdille or the government--will bear the burden of establishing the content of South African law on remand. We note in this regar d that in our discussion above, we implicitly addressed part of this bur den allocation issue when we referenced the government's burden to make the prima facie showing of fir m resettlement. We now make this discussion explicit.

Although this precise issue was not addr essed by the BIA's decision in Abdille's matter, a long line of BIA case law establishes that "[f]oreign law is a matter to be proven by the party seeking to rely on it." Matter of Soleimani, 20 I. & N. Dec. 99, 106 (BIA 1989). Ordinarily, it is the asylum applicant who seeks the benefit of foreign law, and thus carries the burden of demonstrating its content. See, e.g., Sadeghi v. INS, 40 F.3d 1139, 1143 (10th Cir. 1994)

_____

11. On appeal, Abdille argues in the alter native that the BIA's finding of
firm resettlement in South Africa was erroneous because Abdille fell within one of the two exceptions to the fir m resettlement bar contained in 8 C.F.R. S 208.15--i.e., he established "[t]hat his or her entry into that
nation was a necessary consequence of his or herflight from persecution, that he or she remained in that nation only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that nation." 8 C.F .R. S 208.15(a) (2000). Because we remand to the BIA for further proceedings in connection with the firm resettlement issue, we will not address the merits of Abdille's contention.

21

("Placing the burden of proving for eign law on a petitioner is consistent with the general rule that the petitioner bears the burden of proof "); Matter of Annang, 14 I. & N. Dec. 502, 503 (BIA 1973) ("[T]he law of a for eign country is a question of fact which must be proved by the petitioner if he relies on it to establish eligibility for an immigration benefit.").

The BIA, however, has had occasion to apply this rule in order to place burdens on the gover nment. In Soleimani, the immigration judge found that an Iranian Jew hadfirmly resettled in Israel, relying principally on the assumption that, because Israel's Law of Return granted all members of the Jewish faith the right to Israeli citizenship, it was probable that the alien had received an of fer of resident status, citizenship, or some other type of per manent resettlement from the Israeli gover nment. See 20 I. & N. Dec. at 102. Observing that the record contained no evidence "documenting the nature and purpose of Israel's Law of Return or the specific provisions of that law," the BIA reversed the immigration judge's finding on the ground that "[f]oreign law is a matter to be pr oven by the party seeking to rely on it, and the Immigration and Naturalization Service has submitted nothing of r ecord regarding Israel's Law of Return." Id. at 106.

The rule that foreign law is a matter to be pr oven by the party seeking to rely on it must, at all events, be read in conjunction with the INS regulations establishing the general burden of proof allocation with r espect to the firm resettlement issue. The pertinent regulatory provision is 8 C.F.R. S 208.13(c)(2)(ii), which states the following: "If the evidence indicates that one of the above gr ounds [including the firm resettlement bar] apply to the applicant, he or she shall have the burden of proving by a pr eponderance of the evidence that he or she did not so act." 8 C.F .R. S 208.13(c)(2)(ii) (2000) (emphasis added). 12 The burden

_____

12. As a formal matter, we note that, by its terms, the burden scheme contemplated in 8 C.F.R. S 208(c)(2)(ii) applies only to firm resettlement bar contained in 8 C.F.R. S 208(c)(2)(i)(B), which itself applies only to asylum applications filed before April 1, 1997. Abdille's application was filed after April 1, 1997, and thus the fir m resettlement bar applicable to

22

allocation regarding firm r esettlement is thus evident from the language of S 208.13(c)(2)(ii). Under the regulations, the INS bears the initial burden of producing evidence that indicates that the firm resettlement bar applies, and, should the INS satisfy this threshold bur den of production, both the burden of production and the risk of non-persuasion then shift to the applicant to demonstrate, by a preponderance of the evidence, that he or she had not firmly resettled in another country. See, e.g., Mussie v. INS, 172 F.3d 329, 332 (4th Cir. 1999) (applying the S 208.13(c)(2)(ii) burden framework, and noting that "[o]nce the INS met its burden of introducing some evidence indicating that [the applicant] had been `firmly resettled' in Germany, [the applicant] bore the burden of demonstrating, by a preponderance of the evidence, that she had not been resettled"); see also Abdalla v. INS, 43 F.3d 1397, 1399 (10th Cir. 1994) ("Once the government presents some evidence indicating that asylum is unavailable on gr ounds of firm resettlement . . . the petitioner bears the burden of proving by a preponderance of the evidence that such grounds do not apply.") (citations and inter nal quotation marks omitted); Chinese American Civil Council v. Attorney General, 566 F.2d 321, 328 n.18 (D.C. Cir . 1977) ("Resettlement is largely a factual question which, once that fact appears of record, the applicants bear the burden of overcoming.").

We conclude that the burden allocation scheme established by the applicable INS regulations is controlling. Both the INS and Abdille may, at differ ent points in the immigration proceeding, constitute parties seeking to rely on foreign law and, under the regime cr eated by the regulations, both may consequently bear the bur den of producing evidence of the substance of South African immigration law and practice. Specifically, the INS will

_____

his case is found not in the INS regulations, but rather in the federal asylum statute, at 8 U.S.C. S 1158(b)(2)(A)(vi). See supra note 4 and accompanying text. Nonetheless, we find no r eason to believe that Congress, by codifying the firm r esettlement bar, intended to alter the burden scheme contained in 8 C.F.R.S 208.13(c)(2)(ii) and, accordingly, will apply that scheme to Abdille's case.

clearly carry the initial burden of setting forth evidence that "indicates" that Abdille had firmly r esettled in South Africa, and, to the extent that the INS relies on pr ovisions of South African law--e.g. asylum provisions found in the Aliens Control Act--to demonstrate that the South African government granted Abdille "an offer of permanent resident status, citizenship, or some other type of per manent resettlement" within the meaning of 8 C.F .R. S 208.15's firm resettlement definition, it will thus carry the burden of setting forth evidence of the substance of that law.

Should the INS meet this threshold burden of production, however, the burden of introducing evidence to overcome the firm resettlement finding would shift to Abdille, the asylum applicant. If Abdille then seeks to use the substance of South African law to rebut thefirm resettlement finding--e.g., by pointing to particular provisions of the Aliens Control Act thatfix the term of refugee status to two years in order to r ebut the suggestion that he was issued an offer of permanent resettlement-- Abdille will carry the burden of setting forth the relevant content of South African immigration law and practice. Moreover, as contemplated in S 208.13(c)(2)(ii)'s allocation scheme, once the government carries its bur den of production by setting forth evidence that "indicates" that firm resettlement has occurred, Abdille also bears the ultimate burden of persuasion. That is, insofar as Abdille relies on provisions of South African law to defeat the firm resettlement bar, he must prove by a preponderance of the evidence that those provisions render thefirm resettlement bar inapplicable to his case.

VI. Asylum from South Africa

The BIA rejected Abdille's request for asylum from South Africa based on the attacks and the alleged harassment he experienced during his ten months in that country. As discussed supra in Part II, to be eligible for asylum in the United States as a refugee, an alien must demonstrate "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. S 1101(a)(42)(A). The BIA agreed with the IJ that Abdille had

24

failed to carry his burden with respect to establishing either past persecution or a well-founded fear of futur e persecution. Because this issue was squarely pr esented in Abdille's Petition for Review and was fully ar gued, and because the question whether Abdille experienced persecution or a well-founded fear of persecution is independent of the question whether Abdille wasfirmly resettled in that country, we do not believe that remand of this issue to the BIA is warranted. We ther efore proceed to the merits. In light of the deference we owe to the BIA's factual findings under the standard of r eview established in INS v. Elias-Zacarias, 502 U.S. 478 (1992), and for the reasons that follow, we cannot say that the r ecord evidence compels a conclusion contrary to the BIA's and, accordingly, we decide that the BIA's decision with respect to Abdille's request for asylum from South Africa must stand.

A.

Abdille first argues that the BIA's deter mination that Abdille had not established past persecution was not supported by the record evidence. Under 8 C.F.R. S 208.13(b)(1) (2000),

> [a]n applicant shall be found to be a r efugee on the basis of past persecution if he or she can establish that he or she has suffered persecution in the past in his or her country of . . . last habitual residence on account of race, religion, nationality, membership in a particular social group, or political opinion, and that he or she is unable or unwilling to return to or avail himself or herself of the protection of that country owing to such persecution.

Abdille's claim of persecution in South Africa does not arise out of any official action or policy instituted by the South African government. Rather, Abdille alleges persecution at the hands of private groups of attackers that the South African government was either unable or unwilling to control. See Singh v. INS, 94 F .3d 1353, 1360 (9th Cir. 1996) ("Persecution meted out by groups that the government is unable or unwilling to contr ol constitutes

25

persecution under the [Immigration and Nationality] Act. Non-governmental groups need not file articles of incorporation before they can be capable of persecution.") (citation omitted).

To establish past persecution, Abdille set forth evidence establishing that he had suffered individualized attacks, coupled with documentary evidence attempting to link his personal experiences of harassment and violence with the experiences of other similarly situated Somali and African refugees living in South Africa. Abdille's individualized evidence, primarily testimonial in nature, demonstrated that Abdille had suffered two separate attacks while working as a street vendor in public marketplaces in Cape Town. The first occurred in July 1998, when a group of five or six South Africans assaulted Abdille, knocking him unconscious and stealing his merchandise. Abdille went to the police station to make a report concer ning the incident, but the officers told him to return at a later time.13 The second attack took place five months later , when a different group attacked Abdille in a separate market. Abdille fled before he could be injured, but the gr oup did steal all of his goods.

Abdille's documentary evidence, consisting of r eports on South Africa issued by human rights groups and newspaper stories printed in South African newspapers, described in general the xenophobic attitudes taken by South African citizens and politicians towar d African immigrants, and specifically identified instances of violent acts committed against foreigners, including foreign street vendors working in cities such as Cape Town. Among the

_____

13. The Certified Administrative Record is unclear as to whether Abdille did in fact return to the police station to prosecute his claim. In proceedings before the IJ, Abdille testified on direct examination that after he reported the July 1998 attack to the police, "they told me every day come back, come back and they haven't did anything for me," suggesting that Abdille did make subsequent visits that were ultimately unavailing. On the other hand, while being cr oss-examined by the INS concerning this first police report, Abdille appeared to concede that he did not in fact return to the station:"I never went back that day but are there [sic] more than 10 times they say come back and they didn't do anything for me."

26

most pertinent such documents contained in the Certified Administrative Record are: (1) a Mar ch 1998 report issued by Human Rights Watch; (2) a December 1998 r eport put forth by the South African Human Rights Commission; and (3) two stories from the August 6, 1998 issue of Cape Times, a Cape Town newspaper. The Human Rights Watch and South African Human Rights Commission reports document harassment of street vendors similar to that experienced by Abdille.14

The BIA, after noting that Abdille had "intr oduced evidence of criminal behavior by private individuals in South Africa and disturbing documentary evidence of xenophobia in South Africa," concluded that Abdille had failed to sufficiently establish past persecution on account

_____

14. The Human Rights Watch report, titled "Prohibited Persons: Abuse of Undocumented Migrants, Asylum-Seekers, and Refugees in South Africa," contains the following passage:

> Foreign hawkers, often asylum applicants with temporary residence permits, have repeatedly been the tar gets of violent protests and other forms of intimidation as local hawkers attempt to "clean the streets of foreigners." During r epeated violent protests in Johannesburg, South African traders and or dinary criminals have brutally beaten foreign hawkers, and stolen their goods. Hawkers interviewed by Human Rights Watch who wer e the targets of such abuse universally complained to us that the police had done little

or

> nothing in response to their complaints. . . . Human Rights Watch interviewed members of a large community of Somali asylum-seekers who had been forced to abandon their trade and who told Human Rights Watch that they now never left their overcrowded and impoverished compound unless they were in a lar ge group, in order to protect themselves from attacks by hostile "locals."

A similar account of violence against foreign street vendors appears in the South African Human Rights Commission's r eport, titled "1999 Plan of Action: Roll Back Xenophobia Campaign":

> Vigilante groups have vowed to clear for eign traders off the streets

> of Johannesburg, Port Elizabeth and Cape T own. They inflame public opinion with the perception that for eign traders take away jobs from locals by unfairly competing for customers, space and markets. As part of ongoing, hostile campaigns, mobs are raiding foreign hawkers, often causing bodily har m, vandalising their stalls

> and stealing their goods.

27

of one of the five protected factors listed in the statutory definition of refugee, because he could not demonstrate that the violence he suffered was perpetrated by persons that the government was unwilling or unable to control. To buttress this conclusion, the BIA pointed to the fact that there was no evidence that Abdille was harassed or disturbed in Johannesburg during his thr ee-week stay there; that the two attacks Abdille experienced were committed by two separate groups of people; that Abdille could not identify his assailants; and that after r eporting the attacks to the police, Abdille failed to pr osecute these charges by returning to the station, as requested by the police.15

_____

15. The BIA does not appear entirely corr ect with respect to the latter two points. The BIA's claim that Abdille could not identify his assailants is partially undermined by Abdille's testimony before the IJ concerning his response to the first attack in July 1998: "When I went down [to] the police station, . . . I told them I even know the people who attack me because some of them they collect the money in the bus station where I sell my merchandise." The INS concedes that Abdille could identify the perpetrators of this first assault. The recor d appears silent on the issue
of whether Abdille could identify the December 1998 attackers.

With respect to the BIA's assertion that Abdille failed to return to the police station following his reports of the attack, as directed, the record
is not as clear as the BIA appears to assume. As mentioned supra in note 13, the evidence is ambiguous as to whether Abdille visited the police station after reporting the first attack. With regard to the second assault, Abdille testified that he reported the incident to the police, and
"[t]hey said they make appointment and they told me come back tomorrow." The record is silent as to whether Abdille returned the next day as instructed.

Although the BIA's characterization of the r ecord evidence may not have fully accomodated these ambiguities in the r ecord, such error does not ultimately affect our decision to uphold the BIA's denial of Abdille's request for asylum from South Africa. For the reasons stated in the text above, the evidence Abdille did introduce to establish past persecution and a well-founded fear of persecution simply does not compel a conclusion contrary to the BIA's, even if we discount the evidence supporting the BIA's determination so as to take account of its failure to recognize either the fact that Abdille could identify the perpetrators of the first assault, or that Abdille may have made some effort to follow up on his report of the first incident to the police.

To be sure, the record evidence put forth by Abdille is consistent with his theory of persecution. Abdille's testimony demonstrates that he experienced individualized harassment, and the documentary evidence rescribed in the margin, supra at note 14, tends to show that these attacks could have been the product of a more generalized animus among segments of the South African public dir ected at foreign asylum seekers, particularly those r efugees working as street vendors in cities like Cape T own. Furthermore, Abdille's testimony concerning the police's lackadaisical responses to his reports is in accor d with descriptions found in the human rights reports introduced by Abdille of police inaction in the face of private violence against foreign street vendors.

However, the evidence put forth by Abdille is also consistent with acts of private violence that fall short of persecution on account of race, nationality, or membership in a particular social group. The assaults experienced by Abdille at the hands of two different sets of assailants could represent random street violence, motivated not by animosity against a particular ethnic group, but rather by arbitrary hostility or by a desire to r eap financial rewards. Such ordinary criminal activity does not rise to the level of persecution necessary to establish eligibility for asylum. See, e.g., Singh v. INS, 134 F.3d 962, 967 (9th Cir. 1998) ("Mere generalized lawlessness and violence between diverse populations, of the sort which abounds in numer ous countries and inflicts misery upon millions of innocent people daily around the world, generally is not sufficient to permit the Attorney General to grant asylum . . . ."); Sangha v. INS, 103 F.3d 1482, 1487 (9th Cir. 1997) ("[P]ersecution on account of political opinion no longer can be inferred merely from acts of random violence . . . ."). It is also important to note that Abdille was not har med in South Africa except when he was engaged in vending activities in public marketplaces.

In an attempt to establish that he was the victim of persecution, and not just the target of or dinary street violence, Abdille asserts that his situation is identical to the one found in the BIA's recent decision in In re O-Z- & I-Z-, Int. Dec. No. 3346, 1998 WL 177674 (BIA Apr. 2, 1998), in

29

which the BIA concluded that acts of harassment committed by the "Rukh," a pro Ukranian independence group, against a Jewish Ukrainian citizen who advocated unification with Russia, rose to the level of persecution. What Abdille fails to explain, however, is that the record evidence in O-Z- & I-Z- made readily apparent the fact that the "Rukh" assailants were motivated by a desire to penalize the victim's religion. For example, the evidence showed that anti-Semitic leaflets distributed by the "Rukh" were left in the victim's clothing and at his home; that the victim suffered two assaults resulting in physical injuries while on his way home from work and at a bus stop near his home, during which anti-Semitic remarks wer e directed at him; and that the victim's son suffer ed physical and verbal abuse at school as a result of his Jewish background. In contrast to the direct pr oof of ubiquitous religion-based animus presented by the asylum applicant in O-Z- & L-Z-, in the proceedings befor e the IJ, Abdille offered no such comparable evidence, relying instead on descriptions of a generalized climate of hostility in South Africa toward African refugees and for eign street vendors found in human rights groups' reports and newspaper articles.

Aside from such documentary evidence, Abdille furnished no evidence demonstrating that the two attacks he experienced in July and December of 1998 wer e not mere acts of random lawlessness, but rather were perpetrated on account of his race, nationality, or membership in a particular social group. Such tenuous evidence may support an inference that the assaults Abdille suffered rose to the level of persecution, but it does not compel such a conclusion. Accordingly, given our defer ential review, the BIA's decision as to past persecution must stand.

B.

Abdille also avers that the BIA's determination that Abdille failed to establish a well-founded fear of persecution was not supported by record evidence. Under 8 C.F.R. S 208.13(b)(2) (2000),

> [a]n applicant shall be found to have a well-founded
> fear of persecution if he or she can establish first, that

> he or she has a fear of persecution in his or her
> country of . . . last habitual residence on account of
> race, religion, nationality, membership in a particular
> social group, or political opinion; second, that there is
> a reasonable possibility of suffering such persecution if
> he or she were to return to that country; and third,
> that he or she is unable or unwilling to retur n to or
> avail himself or herself of the protection of that country
> because of such fear.

Establishing a well-founded fear of persecution does not require the alien to demonstrate that persecution is more likely than not to occur; rather, fear of persecution "can be well-founded even `when there is a less than 50% chance of the occurrence taking place.' " Chang v. INS, 119 F.3d 1055, 1066 (3d Cir. 1997) (quoting INS v. Cardozo-Fonseca, 480 U.S. 421, 431 (1987)).

Furthermore, the demonstration of a well-founded fear of persecution carries both a subjective and an objective component. The alien must "show that he has a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility." Id. There is no question that Abdille's fear of future persecution in the event of a return to South Africa is subjectively genuine; the only issue is whether that subjective state of mind is buttressed by objective evidence that a r easonable person in Abdille's circumstances would also fear persecution.

In reaching its conclusion that Abdille had not established a well-founded fear of future persecution, the BIA relied primarily on the fact that Abdille had failed to establish that his fear of persecution exists country-wide, and is not confined solely to the Cape Town area. The requirement of demonstrating a country-wide fear of persecution is evident from the BIA's r ecent decision in In re C-A-L-, Int. Dec. No. 3305, 1997 WL 80985 (BIA Feb. 21, 1997), in which a Guatemalan citizen and for mer soldier who had participated in missions against the guerrillas operating in that country sought asylum from Guatemala, claiming that he feared that guerrilla gr oups would persecute him due to his past military service against them. The BIA rejected the applicant's asylum claim, on the ground that documentary evidence demonstrated that

guerrilla activity in Guatemala was localized in particular regions of the country; that the evidence of guerilla activity specifically targeting the soldier showed that such activity was confined to the soldier's hometown; and that the applicant had acknowledged that he had been able to move to and live in other regions of Guatemala without incident. Stating that "an alien seeking to meet the definition of a refugee must do more than show a well-founded fear of persecution in a particular place within a country," the BIA concluded that the applicant's "asylum claim must. . . be denied because he has not provided any convincing evidence to suggest that his fear of persecution would exist throughout Guatemala."

Further, in Etugh v. INS, 921 F .2d 36 (3d Cir. 1990), we employed an almost identical analysis in a case involving a Nigerian citizen seeking asylum from his native country. The applicant claimed that he feared persecution upon return to Nigeria, due to factional fighting between residents of his hometown Akirika and townspeople in the nearly village of Abala. See id. at 37. The BIA had concluded that the applicant had failed to make the requisite prima facie showing of a well-founded fear, in part because he had not established that his safety would be threatened in parts of Nigeria outside of Akirika. We agreed, stating that the applicant "failed to allege[that] he would be persecuted beyond the local vicinity of his hometown, Akirika" and that "deportation would not r equire [the applicant] to return to the purportedly dangerous region of Nigeria where he formerly lived." Id. at 39.

Abdille claims that the record evidence supports a fear of persecution throughout South Africa. Having examined the exhibits in the Certified Administrative Recor d, we cannot agree. By and large, the majority of Abdille's evidence--and certainly the most probative items--focused on harassment and violence only in the Cape Town region of South Africa, which contains but a small part of the country's population. Acts of past persecution suffer ed by an alien are often the best objective evidence supporting the applicant's fear of future persecution, cf.  208.13(b)(1)(i) ("If it is determined that the applicant has established past persecution, he or she shall be presumed also to have a

32

well-founded fear of persecution . . . ."), but the individualized acts of persecution Abdille claims to have experienced occurred only in Cape Town, and only at times Abdille was working as a street vendor selling goods in public marketplaces.

Moreover, as suggested above, the r ecord contains no evidence indicating that after Abdille moved to Johannesburg in January 1999, his three-week stay there was disturbed, and, more importantly, Abdille admitted that he never attempted to live in any region of South Africa other than Cape Town and Johannesburg. Finally, the most pertinent pieces of documentary evidence--i.e., those reports relating attacks on foreign street vendors, rescribed supra in note 14--describe such assaults as occurring in areas around the cities of Cape Town, Port Elizabeth, and Johannesburg; they do not mention whether similar anti-foreigner campaigns exist in other regions of South Africa. Under Elias-Zacarias's deferential standard, we cannot say that such evidence compels a conclusion contrary to the BIA's determination that Abdille failed to establish a well-founded fear of persecution. Accordingly, the BIA's decision as to Abdille's well-founded fear must stand.

VII. Conclusion

We conclude that the BIA's consideration of the question whether Abdille received an offer of some type of permanent resettlement from the South African gover nment was incomplete. We will therefore grant Abdille's Petition for Review, and remand to the BIA for investigation into the content of South African immigration law and practice, for resolution of the question whether Abdille r eceived an offer of some type of permanent resettlement, and for such further proceedings as are necessary to determine Abdille's immigration status. However, we also conclude that the BIA did not err in denying Abdille asylum from South Africa on the ground that he failed to make the r equisite showing of past persecution or a well-founded fear of persecution, and deny the Petition for Review to that extent.

33

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit