

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-14-2004

# Manal Maher Ayad v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-1079

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Manal Maher Ayad v. Atty Gen USA" (2004). *2004 Decisions.* Paper 843.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/843

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 03-1079

———————

MANAL MAHER AYAD,

Petitioner

v.

JOHN ASHCROFT, Attorney General
of the United States,

Respondent

———————

On Petition for Review of a Final Order
of the Board of Immigration Appeals
(No. A75-992-519)

———————

Submitted Under Third Circuit LAR 34.1(a)
March 23, 2004

Before: ROTH, AMBRO, and CHERTOFF, Circuit Judges

(Opinion filed April 14, 2004 )

———————

OPINION

———————

AMBRO, Circuit Judge

Manal Maher Ayad seeks review of a final order of the Board of Immigration

Appeals ("Board") affirming the denial by an Immigration Judge ("IJ") of her application

for asylum and witholding of removal. Because we conclude that the IJ's decision was supported by substantial evidence, we deny the petition for review.

## I. Factual and Procedural History

Ayad, a native and citizen of Egypt, is a Coptic Orthodox Christian. She claims that she was persecuted by Egyptian Muslims based on her religion and therefore qualifies as a refugee for the purposes of section 101(a)(42)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101(a)(42)(A) .

Ayad's application for asylum is based primarily on the conduct of her co-worker, Mohammed Asure, a Muslim Fundamentalist who repeatedly sought to convert Ayad to Islam and allegedly threatened to kill her if she refused to convert. Ayad worked in Cairo as a secretary for an American company, General Dynamics. Asure, also an employee of General Dynamics, pressured Ayad on multiple occasions to convert to Islam.

In March 1997, Asure and two Muslim clerics allegedly appeared at Ayad's home and, when she opened her door, "pushed their way" inside. They urged her to convert to Islam. When she declined, the clerics threatened that she would "pay for it dearly" if she did not convert. Ayad stated that she and her father reported the incident to the police. She then began to receive threatening phone calls. When she confronted Asure at work, he told her, "We tried the nice way with you but you refused to come to Islam. Now you will learn the hard way and if need be by murder." Ayad testified that Asure's conduct became so distressing that she was forced to leave her job, though she admitted on cross-

2

examination that she never reported his behavior to her superiors.

Ayad also claims that in April 1997, while she was returning home from a friend's house, she was attacked from behind. The attacker allegedly fled when a neighbor appeared. She and the neighbor reported the attack to the same police station to which she had reported the previous incident. The police told her that they had no record of her earlier report.

Finally, Ayad stated that in May 1997 her brother was in a car accident. According to Ayad, after the accident her brother received a phone call asserting that "this was a small lesson for [him] but most importantly for me, and to get ready for what was coming up for us all." A police inspector subsequently told Ayad's father that she and her brother should leave Egypt "before it was too late, because soon death would be the only alternative." On cross-examination, Ayad was asked whether she made any effort to relocate within Egypt. She replied, "We moved every once in a while. . . . We stayed with my aunt where nobody knows."

Ayad entered the United States in November 1997 on a temporary nonimmigrant visitor's visa. Her visa expired on May 8, 1998. On September 2, 1998, the INS issued a notice to appear, charging her with remaining in the United States after the expiration of her visa in violation of 8 U.S.C. § 1227(a)(1)(B). Ayad appeared before an IJ on October 29, 1998. She admitted the Government's allegations, conceded that she was removable, and applied for asylum, withholding of deportation, and, if all else failed, voluntary

3

departure.

An IJ conducted a hearing on the merits of Ayad's application on February 16, 1999. With the approval of Ayad's counsel, the parties treated the information in her application as direct examination. The IJ found that Ayad failed to establish past persecution or a well-founded fear of future persecution, and therefore denied Ayad's application, but granted her request for voluntary departure. He concluded that Asure "was the main reason [Ayad] left Egypt." While he found Ayad's testimony regarding Asure credible, he concluded that his conduct "amount[ed] to . . . work place harrassment by a religious zealot" and noted that "[i]njury rising from the actions of persons not connected with any government is not persecution." Similarly, he concluded that the clerics' visit to Ayad's home, while "offensive," "rude," and "even threatening," did not rise to the level of persecution.

With respect to the April 1997 attack, the IJ noted that Ayad had failed to offer any evidence regarding the attacker's identity or motive. He deemed Ayad's claim to have received multiple telephone threats less credible and in any case insufficient to constitute persecution. Furthermore, he was skeptical that Ayad had in fact attempted to relocate, based on her failure to include that information in her asylum application and the "meager" nature of her testimony on the matter upon cross-examination. He found that her failure "to come out more fully with that testimony is an indication of the overall lack of truthfulness that she would have had to pursue had she gone and testified in some

4

detail about her efforts [to] live elsewhere." Finally, the IJ did not credit Ayad's testimony that the police were unhelpful in pursuing Ayad's aggressors, citing record evidence reporting that "the police are actively involved in trying to protect Coptic Christians" in Egypt.

Ayad appealed the IJ's decision to the Board. The Board summarily affirmed the IJ's decision on December 12, 2002, pursuant to 8 C.F.R. § 3.1(e)(4). Ayad timely filed this petition for review within thirty days of the Board's decision. INA § 242(b)(1), 8 U.S.C. § 1252(b)(1).[1]

## II. Discussion

Ayad alleges that the IJ erred in denying her application for asylum because she suffered past persecution and demonstrated a well-founded fear of future persecution. We conclude that the IJ's decision was supported by substantial evidence.

### A. Overview of the statutory framework and standard of review

Section 208(b) of the Immigration and Nationality Act ("INA"), 8 U.S.C.

---

[1]The Board had jurisdiction to review the IJ's decision pursuant to 8 C.F.R. §§ 3.1(b), 3.38, and 240.15. The Department of Justice subsequently reorganized Title 8 of the Code of Federal Regulations to reflect the creation of the Department of Homeland Security and its assumption of the functions previously exercised by the Immigration and Naturalization Service. 68 Fed. Reg. 10349, 2003 WL 724287 (March 5, 2003). The functions of the Executive Office for Immigration Review, which includes the immigration courts and the Board, remain within the Department of Justice under the direction of the Attorney General. Regulations concerning the Board's jurisdiction, previously designated at 8 C.F.R. § 3.2, are now designated at 8 C.F.R. §§ 1003.2. We have jurisdiction under section 242(a)(1) of the INA, 8 U.S.C. § 1252(a)(1).

§ 1158(b), confers on the Attorney General discretion to grant asylum to an alien who is a "refugee." An individual qualifies as a refugee if she is "unable or unwilling" to return to her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

The alien bears the burden of proving eligibility for asylum. 8 C.F.R. § 208.13(a); *Abdille v. Ashcroft*, 242 F.3d 477, 482 (3d Cir. 2001). In order to demonstrate a well-founded fear of persecution, an applicant must satisfy three requirements: (1) she has a fear of persecution in her native country, (2) there is a reasonable possibility of suffering such persecution upon return to that country, and (3) she is unwilling to return to that country as a result of her fear. 8 C.F.R. 208.13(b)(2)(i).[2] A finding that the applicant has suffered persecution in the past results in a presumption that she has a well-founded fear of future persecution. 8 C.F.R. 208.13(b)(1). The Government then bears the burden of demonstrating either (1) a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution, or (2) that the applicant could avoid future persecution by "relocating" within the applicant's country. 8 C.F.R. 208.13(b)(1)(ii).

---

[2]The eligibility threshold for withholding of removal is even higher: the Attorney General must determine that repatriation will more likely than not jeopardize the alien's life or freedom on account of one of the protected grounds. INA § 241(b)(3), 8 U.S.C. § 1231(b)(3). The applicant must therefore demonstrate a "clear probability" of persecution. *Senathirajah v. INS*, 157 F.3d 210, 215 (3d Cir. 1998). Given this higher standard, an applicant who does not qualify for asylum also will not qualify for withholding of removal.

Whether an applicant has demonstrated past persecution or a well-founded fear of future persecution is a factual determination reviewed for substantial evidence. *Abdille*, 242 F.3d at 483. We will affirm the Board's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)). Ayad's burden is therefore quite onerous. In order to reverse the Board's finding, "we must find that the evidence not only *supports* [a contrary] conclusion, but *compels* it." *Elias-Zacarias,* 502 U.S. at 481 n.1 (emphasis in original). Adverse credibility determinations are also reviewed for substantial evidence, *Balasubramanrim v. INS*, 143 F.3d 157, 161 (3d Cir. 1998), and we will affirm the Board's findings unless "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

**B.      The determinations of the Immigration Judge, affirmed by the Board of Immigration Appeals, were supported by substantial evidence**

Reviewing for substantial evidence, we conclude that the IJ's denial of Ayad's application for asylum and the Board's summary affirmance of the IJ's decision were proper.

In her brief to this Court, Ayad argues that "the record of proceedings does reflect sufficient credible evidence submitted in support of Petitioner[']s claim for asylum." Thus she notes, "It is reasonable for [Ayad] to believe that if she moved she may still be pursued by her persecutors." Similarly, she argues that the record "reflect[s] sufficient testimony to establish that [she] did try to live safely elsewhere in the country." The

7

Supreme Court has made clear, however, that any "assertion that 'the record . . . is more than adequate to support [the applicant's] conclusion" is "quite beside the point." *Elias-Zacarias*, 502 U.S. at 480 n.1. To the extent that Ayad urges us to review the record *de novo*, she misunderstands our appellate function. As noted above, we will affirm the Board's decision unless the record *compels* a contrary decision.

We have held that persecution "is an extreme concept that does not include every sort of treatment our society regards as offensive." *Fatin v. INS*, 12 F.3d 1233, 1243 (3d Cir. 1993). The IJ acknowledged that Asure's efforts to convert Ayad to Islam were "unpleasant." But he concluded that Asure's conduct, if accurately described, amounted to workplace harassment that did not fall within the definition of persecution. Moreover, "having to quit a job is not persecution. Being deprived of all likelihood of earning a [living] may well be persecution, but quitting a job at an American corporation . . . is not."

The IJ found that the clerics' visit to Ayad's home, while "offensive," "rude," and perhaps even "threatening," was not persecution. Ayad was never actually injured. Threats alone will rise to the level of persecution only under exceptional circumstances. *See, e.g., Lim v. INS*, 224 F.3d 929, 936 (9th Cir. 2000). Similarly, the IJ deemed the associated telephone threats "less credible, almost an add on," and in any case insufficient to constitute persecution for the reasons given above.

With respect to the attack on Ayad outside her home, the IJ acknowledged the

gravity of the incident and its traumatic effect on Ayad. He correctly noted, however, that Ayad failed to present evidence of the identity of her aggressor or the motive for the attack. To be sure, he might have concluded that the incident was related to a larger pattern whereby members of Ayad's community sought to convert her to Islam through violence. But the evidence did not compel that interpretation.

Furthermore, the IJ found that Ayad had not attempted to relocate within Egypt. He discredited her "vague testimony" alluding to her efforts to live elsewhere. "That testimony," he explained, "was not developed," and "[i]t is contained nowhere in the written application." While incomplete exposition of the circumstances allegedly constituting persecution does not alone render later testimony not credible, the IJ's evaluation of Ayad's testimony was thorough. He noted that while the rest of her hearing testimony credibly tracked her application for asylum, she made no mention of efforts to relocate. On the contrary, as the Government notes, her application, which expressed that she "had no other place to turn to," implied that any effort to relocate would have been futile.[3] The transcript of the hearing reveals that Ayad was inarticulate and imprecise in describing her alleged moves.

Finally, the IJ characterized Ayad's mistreatment as private in nature. To establish eligibility for asylum, an applicant must demonstrate that she was persecuted "by the

_____

[3]She did not press this argument at the hearing, presumably because it would have been inconsistent with her claim to have attempted to relocate.

9

government or forces the government is either unable or unwilling to control."

*Abdulraham v. Ashcroft*, 330 F.3d 587, 592 (3d Cir. 2003) (internal quotations omitted).

Ayad, however, was never detained by the police. In light of record evidence indicating that the Egyptian police have aggressively investigated attacks on Coptic Christians, the IJ reasonably discredited Ayad's testimony that the police were unresponsive to her complaints. He explained, "[T]he known circumstance in Egypt is that the police are actively involved in trying to protect Coptic Christians. They do not wink at abuses against the Christian population. The testimony was not persuasive in rebutting the State Department's conclusions in that regard."

### III. Conclusion

In sum, the IJ's findings were supported by substantial evidence. Ayad's testimony, even if accurate in its entirety, does not compel a determination that she has suffered persecution in the past or is likely to suffer persecution if she is returned to Egypt. Because Ayad does not qualify as a refugee, she also fails to qualify for withholding of removal. The Board's decision affirming the IJ's denial of Ayad's application for asylum was therefore proper, and we deny Ayad's petition for review.