**YITANG SHENG, Petitioner**

v.

**The ATTORNEY GENERAL OF the UNITED STATES, Respondent.**

No. 08–4805.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1(a) Feb. 10, 2010.

Opinion filed: Feb. 16, 2010.

Gary J. Yerman, Esq., Yerman & Associates, New York, NY, for Petitioner.

Thomas W. Hussey, Esq., Glen T. Jaeger, Esq., Daniel I. Smulow, Esq., United States Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before: Chief Judge SCIRICA, SMITH and WEIS, Circuit Judges.

OPINION

PER CURIAM.

Yitang Sheng petitions for review of the Board of Immigration Appeals' ("BIA") final order of removal. For the reasons that follow, we will deny the petition.

I.

Sheng, a native and citizen of the People's Republic of China, entered the United States on a J–1 visa in September 1987. In November 1988, he married Juanita Dilan, a United States citizen. About a month after they were married, Mr. Sheng returned to China to fulfill the foreign residency requirement of his visa. Approximately ten months after he returned to China, Ms. Sheng gave birth to a child by another man, but still remained married to Mr. Sheng. After Mr. Sheng fulfilled his foreign residency requirement, he reentered the United States in July 1990 and was admitted as a conditional lawful permanent resident ("LPR").

In May 1992, the Shengs jointly filed an I–751 petition to remove the conditions of Mr. Sheng's LPR status. In July 1992, Lisa Hoechst, an officer with the former INS, interviewed them individually to assess the validity of their marriage. Ms. Sheng indicated during her interview that she had been paid to marry Mr. Sheng. In light of this interview, INS terminated his LPR status.

In May 1994, INS initiated deportation proceedings (now referred to as removal

proceedings) against Mr. Sheng. When he did not appear at an August 1997 hearing, the Immigration Judge ("IJ") ordered his removal in absentia. Mr. Sheng subsequently filed a motion to reopen, which the IJ granted in May 1998. The case was continued to allow Mr. Sheng to prepare a challenge to INS's termination of his LPR status.

In May 2002, while Mr. Sheng's case was still pending,[1] INS special agents Maurice Hall and David Christino visited the Shengs' apartment in Bethlehem, Pennsylvania, and obtained an affidavit from Ms. Sheng stating, inter alia, that she "only married [Mr. Sheng] for the money and so he could get his green card." (Admin. Rec. at 825.) Mr. Sheng moved to suppress the affidavit, arguing that the INS agents had obtained it via threats and coercion. The IJ denied the motion in June 2002.

Over the course of two merits hearings, held in November 2003 and June 2005, respectively, the IJ heard testimony from the Shengs, Hoechst, Special Agents Hall and Christino, and three other witnesses. During these two hearings, Ms. Sheng testified on four separate occasions. The IJ also reviewed a videotape recording of Ms. Sheng's 1992 INS interview.

In November 2005, the IJ issued a written decision upholding the Government's termination of Mr. Sheng's LPR status and ordering his removal to China. In doing so, the IJ concluded that "the overwhelming circumstantial evidence in this case clearly indicates that [Mr. Sheng's] marriage was not *bona fide*." (Decision of IJ at 33.) The IJ, who characterized the documentary evidence submitted in support of the marriage as "meager," (*see id.* at 35), noted that

[a]t the time they were married, [the Shengs] spoke no common language, and they appear to have had little in common other than working for the same employer. Indeed, in addition to their notable cultural differences, there was a conspicuous age gap between them as well as a significant difference in education and background. Moreover, shortly after marrying [Mr. Sheng], Ms. Sheng became pregnant by another man and ultimately gave birth to that child while [Mr. Sheng] was in China. By contrast, the record is unclear as to whether the Shengs' marriage was ever consummated, and even if the Shengs did engage in sexual relations, it seems that they did so only once during the course of their nearly 17–year marriage. Additionally, the Shengs lived apart for most of their marriage, particularly during the times when [Mr. Sheng] returned to China, when he worked in New Hampshire and other locations while she lived in Pennsylvania, and when he moved to New York City while she, again, remained in Pennsylvania. (*Id.* at 33–34.)

The IJ further explained that "[m]ost damning to [Mr. Sheng's] arguments about the *bona fides* of his marriage ... is the testimony of his wife." (*Id.* at 34.) The IJ emphasized that, both in the 1992 INS interview and during the 2002 home visit, Ms. Sheng admitted that she had been paid to marry Mr. Sheng. Although Ms. Sheng, in testimony before the IJ, claimed that she was under the influence of drugs on the day of the 1992 INS interview, the IJ "watched the videotape of her interview and found her to be coherent and lucid." (*Id.*) Moreover, although Ms. Sheng claimed that her 2002 affidavit was the

---

1. The IJ held multiple hearings between 1998 and 2002 but did not reach the merits of the case.

product of coercion, the IJ found that the special agents' testimony was credible and that "there is no reason to doubt the veracity of [the affidavit]." (*Id.*) Additionally, the IJ stated that Ms. Sheng was "defensive and evasive" during her testimony.[2] (*Id.* at 35.)

Mr. Sheng appealed the IJ's decision, but the BIA dismissed the appeal as untimely and subsequently denied his motion to reopen. Mr. Sheng, represented by new counsel, subsequently filed a motion requesting the BIA to accept his untimely appeal, arguing that his former counsel had provided ineffective assistance in filing the appeal late. The BIA granted the motion in December 2007.

In November 2008, the BIA adopted and affirmed the IJ's decision. The BIA stated that, contrary to Mr. Sheng's contention, the IJ properly considered all of the evidence. The BIA also concurred with the IJ's conclusion that the documentary evidence Mr. Sheng submitted in support of the marriage was "meager," observing that most of the evidence post-dated the 1992 INS interview. Finally, the BIA rejected Mr. Sheng's argument that the IJ based her decision on "impermissible speculation." Mr. Sheng now seeks review of the BIA's decision.

## II.

We have jurisdiction over Mr. Sheng's petition for review pursuant to 8 U.S.C. § 1252(a)(1). We review the BIA's decision adopting and affirming the IJ's decision for substantial evidence. *See Dia v. Ashcroft*, 353 F.3d 228, 248 (3d Cir.2003) (en banc); *see also Huang v. Mukasey*, 523 F.3d 640, 649 (6th Cir.2008) ("On appeal, we review to determine whether substantial evidence supports the factual findings underlying the IJ's decision regarding

the nature of the marriage...."). Under this deferential standard of review, we must uphold the agency's findings "unless the evidence not only supports a contrary conclusion, but compels it." *Abdille v. Ashcroft*, 242 F.3d 477, 483–84 (3d Cir. 2001).

An alien who marries a United States citizen may obtain conditional LPR status. *See* 8 U.S.C. § 1186a(a)(1). In the ninety-day period immediately before the second anniversary of the alien's obtaining conditional LPR status, the alien may petition to remove those conditions. *See* 8 U.S.C. § 1186a(c)(1), (d)(2). The petition must show, inter alia, that the marriage "was not entered into for the purpose of procuring [the] alien's admission as an immigrant." *See* 8 U.S.C. § 1186a(d)(1). If the Attorney General determines that the marriage is not bona fide, the alien's LPR status is terminated. *See* 8 U.S.C. § 1186a(c)(3)(C). The alien can seek review of this determination in removal proceedings, where the Attorney General must show, by a preponderance of the evidence, that the marriage is a sham. *See* 8 U.S.C. § 1186a(c)(3)(D). The relevant inquiry is whether the couple "intend[ed] to establish a life together at the time they were married." *Bark v. INS*, 511 F.2d 1200, 1201 (9th Cir.1975). The couple's conduct after the marriage is relevant only to the extent that it evidences their state of mind at the time they married. *Id.* at 1202.

The substantial evidence in this case supports the IJ's determination that the Shengs' marriage was not bona fide. First, on two separate occasions—ten years apart from one another—Ms. Sheng admitted that she had been paid to marry Mr. Sheng. These admissions are

---

**2.** During her June 2005 testimony, Ms. Sheng admitted that she and Mr. Sheng had separat-

ed in 2004.

supported by a videotape recording of her 1992 interview and the testimony of three INS officials. Second, Mr. Sheng submitted only limited documentary evidence in support of the marriage, and the BIA correctly observed that much of this information concerned events that occurred after the 1992 INS interview (which itself took place nearly four years after they married). Finally, the circumstantial evidence cited by the IJ, especially the fact that Mr. and Ms. Sheng spent most of their marriage living apart in different states, suggests that the couple did not intend to establish a life together.

Mr. Sheng argues that the IJ failed to explain why she found the testimony of the Government's witnesses credible or why she "discounted" the testimony of Ms. Sheng and his other witnesses.[3] We recognize that the IJ could have been more explicit and detailed in setting forth some of the reasoning for her findings. Nonetheless, given the circumstances of the Shengs' marriage, the limited documentary evidence, and the videotape recording of Ms. Sheng's 1992 interview, Mr. Sheng has not shown that the record compels the conclusion that his marriage was bona fide. Accordingly, we will deny the petition.

---

**3.** Because Mr. Sheng did not present his two other claims to the BIA, we lack jurisdiction to consider them here. *See Abdulrahman v.* *Ashcroft,* 330 F.3d 587, 594–95 (3d Cir.2003). We note, however, that these unexhausted claims appear to lack merit.