# United States Court of Appeals
## For the First Circuit

No. 05-2724

EMMANUEL JEAN,

Petitioner,

v.

ALBERTO GONZALES,
Attorney General of the United States,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Lynch, and Howard,
Circuit Judges.

Susanna L. Shafer on brief for petitioner.
Greg D. Mack, Senior Litigation Counsel, Office of Immigration
Litigation, Civil Division, Peter D. Keisler, Assistant Attorney
General, and Terri J. Scadron, Assistant Director, Civil Division,
on brief for respondent.

August 31, 2006

**LYNCH**, **Circuit Judge**. Petitioner Emmanuel Jean, a native and citizen of Haiti, appeals from a final order of removal of the Board of Immigration Appeals (BIA), which denied his petitions for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). An Immigration Judge (IJ) found that Jean was not credible, and that he had not met his burden of establishing past persecution or a well-founded fear of future persecution. The IJ also found that even if Jean had established past persecution, circumstances in Haiti had changed fundamentally such that Jean no longer had a well-founded fear of persecution there. In a per curiam order, the BIA affirmed and adopted the IJ's ruling. We affirm the BIA and deny the petition.

## I.

On or about October 23, 2002, Jean entered the United States as a non-immigrant visitor. He was authorized to remain in the United States until April 22, 2003. Jean did not depart by that date, and thereafter his presence in the United States was unauthorized. On October 22, 2003, Jean filed an application requesting political asylum and withholding of removal based on his political opinion and membership in a particular social group. Jean also requested protection under the CAT.

In support of his application, Jean offered documentary and testimonial evidence that he had experienced persecution in Haiti on account of his political opinion. The facts as presented

-2-

by Jean were as follows. Jean claimed that he was known in Haiti to oppose Aristide and his government. He claimed that as a result, he was harassed and threatened by Aristide supporters. The first such incident occurred in 1991, after Aristide first came to power. Aristide supporters demonstrating in the streets stopped Jean's car and asked why he displayed no symbol of support for Aristide. They threatened to burn his car with him inside unless he kissed a picture of Aristide, which he did do. In addition, Jean testified that numerous times in 1991, members of Lavalas -- Aristide's political party -- threw feces at his home.

A coup in 1992 displaced Aristide, and Jean reported that he experienced no further persecution until Aristide returned to power in 1994. At that point, Jean claimed, members of Lavalas, in addition to members of les Chimères -- a group of radical Aristide supporters -- once again began harassing him. This harassment continued until Jean's final departure from Haiti in 2002. Jean testified that during this time, he and his wife received repeated threatening phone calls. In addition, Jean alleged that members of les Chimères would visit his store and home and demand money from him. In 1994, one of Jean's stores was looted, and Jean suspected Lavalas. He claimed that although he reported the incident to the police, they failed to investigate it. Jean also stated that in 2002, his store and home were burned down by people he believed to be supporters of Aristide. Jean testified that he left Haiti for

the United States in October of 2002 because the Haitian government had issued a warrant directing him to appear in court. He reported that a friend had told him that "people [who] receive[] these warrants are often killed." After Jean left Haiti, members of Lavalas apparently went to his brother's store and asked for Jean. When Jean's father told the men that Jean was not there and refused to provide further information, the men shot Jean's father in the leg.

Jean also offered evidence that he had a well-founded fear of persecution based on his membership in a particular social group -- his family. He claimed that Lavalas wished to kill him because of his prior association with his wife's brother and cousin, both of whom were killed by members of Lavalas because of their opposition to the party.

Between 2000 and 2002, Jean traveled to the United States several times. At no time during these visits did he apply for asylum. Each time, he voluntarily returned to Haiti. Jean testified that during those prior visits to the United States he felt he could "go back to [his] country at any time because [he] didn't have any problem with the government."

In a decision issued June 24, 2004, the IJ denied Jean's applications for asylum, withholding of removal, and CAT protection, but granted Jean the privilege of voluntary departure until August 9, 2004. In her opinion, the IJ stated that she found

the petitioner and his wife -- who testified in support of his application -- not credible. In particular, she found that "[Jean's] testimony was materially inconsistent with his written asylum claim and was contradicted by certain aspects of his supporting documents." The IJ also found it incredible that Jean and his wife would have voluntarily returned to Haiti several times after having received threats from members of Lavalas.

The IJ went on to note that even if Jean had been credible, he still would have failed to establish a well-founded fear of persecution in Haiti. In making this determination, the IJ considered only those events that purportedly took place after Jean's last voluntary return to Haiti. She found that these events -- threatening phone calls, solicitation of money by Aristide supporters, and the burning down of Jean's home and store -- did not amount to persecution. Further, she found that even if Jean had shown past persecution, circumstances in Haiti had fundamentally changed such that he no longer had a well-founded fear of persecution there. "Specifically, the forced ouster of President Aristide, the posting of international troops to Haiti and the installation of a new, non-Lavalas, government cumulatively constitute a fundamental change in circumstances in [Haiti]."

In a per curiam order issued on October 17, 2005, the BIA affirmed without opinion and adopted the IJ's ruling. The BIA also

extended the time within which Jean was permitted to depart the United States voluntarily to December 1, 2005.

                                II.

Jean makes several claims on appeal. First, he argues that the IJ wrongly found him not credible. Second, he asserts that the IJ wrongly failed to consider "periodic persecution" and the persecution of Jean's family in ruling on his asylum claim. Third, Jean argues that the BIA's failure to reassess country conditions at the time of his appeal "robbed him of a reasoned administrative decision." Finally, he claims that the BIA's issuance of an affirmance without opinion was procedural error. We consider only Jean's challenges to the IJ's credibility finding and the BIA's summary affirmance procedure. Because we find that the IJ's credibility determination is supported by substantial evidence, we do not reach Jean's other challenges to the IJ's asylum determination.

Normally, we review the BIA's decision. Romilus v. Ashcroft, 385 F.3d 1, 5 (1st Cir. 2004). However, when the BIA adopts the IJ's opinion, we review the opinion of the IJ as if it were the BIA's. Id. ("When the BIA does not render its own opinion, . . . and either defers [to] or adopts the opinion of the IJ, a Court of Appeals must then review the decision of the IJ." (quoting Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003)

(internal quotation marks omitted))); see also 8 C.F.R. § 1003.1(e)(4)(ii).

To be eligible for asylum, an alien must demonstrate that he is a "refugee." 8 U.S.C. § 1158(b)(1)(A). To do so, the alien must show that he fears persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A); see also Mukamusoni v. Ashcroft, 390 F.3d 110, 119 (1st Cir. 2004). The alien bears the burden of proof for establishing his eligibility for asylum. 8 U.S.C. § 1158(b)(1)(B)(i). Whether or not an alien is credible is a factual determination that we review under the deferential substantial evidence standard. Kheireddine v. Gonzales, 427 F.3d 80, 88 (1st Cir. 2005). Thus, we will uphold the agency's determination "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 123 (1st Cir. 2005).

Here, substantial evidence supports the IJ's finding that Jean and his wife were not credible. Jean offered inconsistent testimony about many of the incidents that form the basis of his claim. In an affidavit accompanying his application for asylum, Jean stated that his friend informed him that his store had been burned down by men wearing masks. However, in his testimony before the IJ, Jean first testified that his friend had not described the appearance of the attackers. When questioned by the IJ about whether his friend had been able to see the attackers' faces, Jean

stated that because it was dark, his friend had been able to observe only the hair and clothing of the attackers. When the IJ specifically asked whether the men had been wearing masks, Jean initially said he didn't know. He then dodged the question why his testimony differed from his affidavit, and subsequently changed his testimony to conform to his affidavit. Similarly, on cross-examination Jean embellished his description of the attackers, stating that they wore their hair in braids -- as Aristide supporters were known to do -- and wore t-shirts indicating their support for Aristide. When asked why he had failed to include this information in his direct testimony and in his affidavit, Jean simply stated that he didn't "know how this [information] could have been omitted."

There also were discrepancies in Jean's written and oral testimony about his reporting the arson to authorities. Jean testified that when he reported the incident to a Justice of the Peace, he did not mention his suspicions that Lavalas had been involved for fear that otherwise the Justice of the Peace would not investigate the fire. The report prepared by the Justice of the Peace, however, indicates that Jean had told him that Lavalas was involved. When questioned about the discrepancy, Jean testified first that he had hinted to the Justice of the Peace that Lavalas had burned his house. He then changed his testimony again and stated that he told the Justice of the Peace that the arson had

been committed by Lavalas, but he did not think that the Justice of the Peace would include this information in his report.

Jean also testified inconsistently about the month in which his father was shot. One might expect the date of such a traumatic event to have stuck in Jean's mind, but only two-and-a-half months later, Jean gave testimony that was at variance with the documentary evidence he later submitted. In April 2004, Jean testified that his father had been shot in February of that year. But in June 2004, Jean revised his testimony and stated that his father had been shot in January, on the date shown on hospital records he submitted.

Further, Jean offered into testimony an affidavit supposedly made by his father the day he was shot. When Jean was first questioned about the affidavit, he testified that it was not made by his father, but was made by someone else and given to his father. However, once made aware that the affidavit itself indicated otherwise, Jean revised his testimony so that it was consistent with his father's affidavit. When asked why his father would need to make a sworn statement the same day he was shot, Jean did not offer an intelligible answer.

During his removal proceedings, Jean testified to additional incidents of harassment not included in his written application. These incidents included members of Lavalas's throwing feces at his home. Jean testified that he did not include

these incidents in his initial report because "it wasn't really necessary" and because he "did not remember the dates and . . . had no proof." This explanation is unconvincing. Jean included several incidents in his written application that he did not report to police and of which he had no proof, including the threatening calls to his home.

Finally, despite Jean's assertion to the contrary, his and his wife's willingness to return voluntarily to Haiti on multiple occasions undermines the contention that Jean experienced persecution and has a well-founded fear of persecution there.

Jean offers several explanations for the inconsistencies in his testimony. He argues that he could not fully understand his application affidavit because it was in English. But when the IJ asked him during his removal proceedings whether someone had explained to him in Creole those parts of his affidavit that he could not understand, Jean replied, "Yes, they did . . . explain it to me." Likewise, Jean's attempt in his brief to minimize the discrepancies between his asylum application and his testimony are disingenuous. The IJ's opinion did not state, as Jean claims, that Jean had never mentioned in his asylum application that Aristide supporters wear their hair in braids or wear t-shirts indicating their political affiliation. Rather, the IJ noted that Jean had not indicated in his application that the men who burned down his store wore their hair in braids and wore t-shirts displaying

pictures of Aristide.  Jean argues that his expansion of his testimony on cross examination was an inadequate basis for an adverse credibility finding.  But Jean's testimony on cross examination was not merely embellished; at times it was completely contradictory to his testimony on direct examination or in his affidavit.  Jean also argues that the testimony about his father's having been shot varied because he was not in Haiti at the time and was forced to rely on family members to transmit information to him.  Again, Jean misrepresents the facts.  In April 2004, when he first testified about his father's shooting, Jean had already received documents indicating that his father had been shot in January, rather than February.  Indeed, in June, Jean testified that in April he had "forgot[ten] the date" that his father had been shot.  The information in his possession with regard to the date his father was shot did not change between April and June.

The IJ's adverse credibility determination is amply supported by the record.[1]  We therefore decline to consider Jean's other challenges to the IJ's denial of asylum.

As for Jean's objection to the BIA's summary affirmance procedure, we have long since rejected arguments challenging that procedure.  See, e.g., Albathani, 318 F.3d at 377-79.

---

[1]    The assertion that the IJ's determination deserves little deference because she was unable to observe Jean's demeanor is without merit.  The IJ specifically asked Jean to position himself so that she could observe him on the video-conference screen.

-11-

The petition for review is <u>denied</u>.