IMG-143                                                        NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-2477
_____

MOHAMED RIZWAN KAMURDEEN,
                                        Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
                                        Respondent

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A098-580-337)
Immigration Judge:  Honorable Henry S. Dogin
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
April 1, 2010

Before:  RENDELL, FISHER and GARTH, Circuit Judges.

(Filed: April 13, 2010)
_____

OPINION
_____

PER CURIAM

        Mohamed Rizwan Kamurdeen petitions for review of the Board of Immigration

Appeals' ("BIA") final order of removal.  We will deny the petition.

I.

Kamurdeen is a citizen of Sri Lanka who arrived in the United States in 2003 on a visitor's visa, which he overstayed. He concedes removability, but seeks asylum, withholding of removal and relief under the Convention Against Torture on the grounds that he suffered past mistreatment in Sri Lanka and fears future mistreatment if returned.

According to Kamurdeen's asylum application statement (A.R. 326-28), he and his family lived in an apartment next to their landlord's home. On May 19, 2000, two ethnic Tamil school friends of Kamurdeen visited him at his family's apartment. His landlord and the landlord's two sons, who "did not like" ethnic Tamils, came to his apartment and asked him not to let his friends stay the night. A fight between the landlord's sons and Kamurdeen's friends ensued, but the landlord and his sons ultimately left the scene. Approximately one hour later, army personnel who were friends of the landlord's son Sisira visited the landlord's house, then came to Kamurdeen's apartment, beat his Tamil friends, beat Kamurdeen and his father when they intervened, and told his friends to leave immediately or be arrested under suspicion of association with the rebel Tamil Tigers. Kamurdeen's friends then left.

On June 5, 2000, "in the midnight," Kamurdeen heard screaming from the landlord's house and saw masked men with weapons abducting his son Sisira and driving him away in a van. The landlord and his other son then came to Kamurdeen's apartment, told him that the assailants were Tamil, and accused his friends of being involved. Army

2

officers arrived shortly afterwards, questioned Kamurdeen about the incident, and then arrested him and took him to an army camp. While there, they accused him of supporting the Tamil Tigers and interrogated him about his Tamil friends, his landlord's son's whereabouts, and the assassination of a prominent politician. They also beat and tortured him, at one point hanging him from a bar and pouring water on his head when he collapsed. The army ultimately released him on August 15, 2000, in exchange for a bribe paid by his father, but instructed him to report back once per week until further notice.

Kamurdeen left Sri Lanka the next month, working for a period of time in Dubai and then Kuwait. He obtained a visa to travel to the United States while in Kuwait with the assistance of an "agent," who told him he would have to return to Sri Lanka and travel to the United States from there. Kamurdeen did so, and stayed in a hotel near the airport for approximately two weeks until leaving for the United States on September 14, 2003.

Before the IJ, Kamurdeen submitted an affidavit from his mother, which was substantially in accord with his statement. He also testified consistently with his statement and his mother's affidavit, with the significant exceptions discussed below. The IJ assumed that Kamurdeen stated grounds for asylum and withholding of removal on the basis of imputed political opinion. He denied Kamurdeen's claims, however, because he found Kamurdeen not credible on the basis of numerous inconsistencies and implausibilities in his testimony. He also faulted Kamurdeen for failing to produce certain corroborating evidence. The BIA upheld the adverse credibility determination on

3

the basis of several factors on which the IJ relied, but did not mention any concern with corroboration. Kamurdeen petitions for review.[1]

## II.

The BIA identified three deficiencies that it deemed collectively sufficient to support the IJ's adverse credibility determination. (BIA Dec. at 1-2.) First, and "[m]ost strikingly" according to the BIA, is an inconsistency regarding the date and circumstances of Kamurdeen's arrest. Kamurdeen stated in his asylum application, and his mother stated in her affidavit, that the army arrested him and took him to the army camp on the night of June 5, 2000, after questioning him about the abduction of his landlord's son. (A.R. 170, 327.) Before the IJ, however, Kamurdeen testified that the army left that night without arresting him and "went away" because it could not locate his friends. (A.R. 110-11.) After the army left, Kamurdeen spoke with his father about moving to a new house, and he and his father informed the landlord that the family would be moving. (A.R. 111,

_____

[1] We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1). Our jurisdiction generally extends only to the BIA's order, but we may also review the IJ's decision in pertinent part where "the BIA both adopted the IJ's adverse credibility determination and discussed some, but not all, of the underlying bases" for that determination. Xie v. Ashcroft, 359 F.3d 239, 242 (3d Cir. 2004). We need only review the BIA's decision in this case, however, because it independently discussed certain factors that it deemed collectively sufficient to support the IJ's ruling. We do so for substantial evidence, and may disturb the BIA's adverse credibility determination only if "'any reasonable adjudicator would be compelled to conclude to the contrary.'" Lin v. Att'y Gen., 543 F.3d 114, 119 (3d Cir. 2008) (citation omitted). Because Kamurdeen filed his application prior to the effective date of the REAL ID Act, the inconsistencies on which the BIA relied "must not be 'minor' and must go to the heart of [his] claim." Id.

4

151-52.) Kamurdeen also testified that he did not go to work the following day but instead stayed home. (A.R. 153.) He testified that the army returned to his house and arrested him two months later on August 5, 2000. (A.R. 110-11.)

When the IJ asked Kamurdeen about this inconsistency, he first testified that the army had arrested him on June 5 as set forth in his statement, then testified again that it was August 5, and finally testified that he had been released rather than arrested on August 5 (as opposed to August 15, as claimed in his statement and his mother's affidavit). (A.R. 156, 166.) When further pressed, Kamurdeen testified only that the inconsistency was the result of "(Indiscernible.) Confusion." (A.R. 166.)

This inconsistency strikes us as the most glaring and material inconsistency of record. Kamurdeen, however, barely acknowledges this inconsistency on review, and neither offers any explanation for this inconsistency nor argues that the BIA erred in relying on it. He also "d[id] not address this glaring inconsistency on appeal" before the BIA. (BIA Dec. at 1). Thus, he has both waived and failed to exhaust any challenge to the BIA's reliance on this inconsistency.[2]

_____

[2]Nevertheless, the BIA did not err in relying on this inconsistency. The record confirms the inconsistency, and it clearly goes to the heart of Kamurdeen's claim. Cf. Gabuniya v. Att'y Gen., 463 F.3d 316, 322-23 (3d Cir. 2006) (six-day discrepancy regarding date of arrest did not go to the heart of the claim where alien immediately explained that he had mistakenly referred to date of an assassination that triggered the arrest). Kamurdeen also offered no explanation for the inconsistency except to testify that it was the result of "(Indiscernible.) Confusion." (A.R. 166.) Kamurdeen did not elaborate on that "confusion" before the BIA or in his brief in this Court and makes no argument regarding what appears as "indiscernible" on the transcript.

Second, the BIA relied on additional discrepancies regarding the circumstances of the June 5 incident. Kamurdeen asserted in his statement that he first heard screaming from his landlord's house "in the midnight" on June 5, that he then looked out the window and witnessed Sisira's abduction, and that his landlord and the army came to his apartment thereafter. (A.327.) Similarly, his mother stated in her affidavit that the family heard the screaming "while we were fast asleep." (A.R. 170.) Before the IJ, however, Kamurdeen testified that Sisira was kidnapped at around 7:30 p.m. and that he and his father were awake and sitting outside when he witnessed the abduction. (A.R. 153-54.)

Kamurdeen argues with little elaboration that the IJ improperly found an inconsistency on the basis of a mere absence of "definitive testimony" regarding the time of the incident. Our review of the record, however, confirms that the BIA permissibly found an inconsistency on these points. Kamurdeen does not argue that the record can be read in a way that reconciles the apparent inconsistencies, and the record does not compel such a reading. Kamurdeen also does not argue that these inconsistencies are insufficiently related to his claim to support an adverse credibility determination, and we do not believe they are.

Third, the BIA found Kamurdeen's account of voluntarily returning to Sri Lanka for two weeks without consequence incompatible with his claim that he was tortured there and that the army had ordered him to report on a weekly basis. Under some circumstances, voluntary return to a country where a petitioner claims to have been

6

tortured can undermine his or her claims of past persecution and fear of future persecution. See Jean v. Gonzales, 461 F.3d 87, 91 (1st Cir. 2006); Toure v. Att'y Gen., 443 F.3d 310, 318 (3d Cir. 2006).

In this case, Kamurdeen argues that the IJ and BIA disregarded his explanation for returning – i.e., that he did so on the insistence of the agent who procured his United States visa, then remained in hiding at the hotel near the airport. As Kamurdeen testified, the agent promised him that he would be safe if he did not contact anyone in Sri Lanka, including his family, and he followed that instruction by having no contact with anyone but his agent, including his mother. (A.R. 129-30, 160.) His mother, however, stated in her affidavit that she visited Kamurdeen at his hotel. (A.R. 171.) Kamurdeen offered no explanation for that inconsistency except to deny that the visit occurred. (A.R. 160.) The BIA rejected Kamurdeen's explanation on the basis of his mother's affidavit, and we cannot say that the record compelled it to do otherwise.

The BIA held that these factors were sufficient to support the IJ's adverse credibility determination. It then went on to note that the record was "replete" with other inconsistencies and discussed two additional bases for the IJ's decision. Because the BIA concluded that the deficiencies discussed above are sufficient to support the adverse credibility determination, however, and because the record does not compel a contrary

7

conclusion, we need not reach the additional inconsistencies.[3]  Accordingly, we will deny

the petition for review.[4]

---

[3]We note, however, that we perceive no error in the BIA's reliance on them.  Both Kamurdeen's statement and his mother's affidavit refer to their "landlord" and use the pronouns "he," "his" and "him" in doing so.  (A.R. 169-70, 326-27.)  Kamurdeen initially did the same in his testimony.  (A.R. 99-103, 107-08.)  On further questioning, however, he began to refer to a "landlady" and use feminine pronouns, and he testified that it had been the family's female landlord, not her husband, who was involved in the incidents recounted above.  (A.R. 132-34.)  In addition, regarding the May 19 incident, Kamurdeen asserted in his statement that the landlord's "sons," plural, attacked his friends and that his friends responded by attacking his landlord's sons.  (A.R. 326.)  His mother stated the same in her affidavit, and also stated that she intervened to stop the fighting along with Kamurdeen and his father.  (A.R. 169).  Before the IJ, however, Kamurdeen testified that only his landlord's oldest son Sisira was involved in the altercation (A.R. 144), and that only he and his father intervened and that "my mother didn't get involved" (A.R. 145).

[4]In his brief, Kamurdeen challenges the IJ's insistence on certain corroboration. The BIA, however, relied solely on inconsistencies and implausibilities in Kamurdeen's testimony and neither faulted Kamurdeen for failing to corroborate his testimony nor adopted that portion of the IJ's ruling in which the IJ did so.  See Chukwu, 484 F.3d at 191 (noting that credibility and corroboration are distinct issues).  Thus, we do not reach the issue of corroboration because it formed no basis for the BIA's decision.  Cf. id. at 188, 191 (reaching issue where BIA adopted the IJ's decision).