**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1367
_____

GULIZAR SULEYMANOVA,
                                        Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
                                        Respondent
_____

APPEAL FROM THE BOARD OF IMMIGRATION APPEALS
(Agency No. A200 919 355)
Immigration Judge:  Honorable Steven Morley
_____

Submitted Under Third Circuit LAR 34.1(a)
October 10, 2013
_____

Before: FUENTES, COWEN and BARRY, <u>Circuit Judges</u>

(Opinion Filed: October 29, 2013 )
_____

OPINION
_____

BARRY, <u>Circuit Judge</u>

Petitioner Gulizar Suleymanova, a native of Turkmenistan and citizen of Russia,

petitions for review of an order of the Board of Immigration Appeals ("BIA") affirming

the Immigration Judge's ("IJ") denial of her application for asylum, withholding of

removal, and protection under the Convention Against Torture ("CAT"). We will deny the petition.

I.

Because we write primarily for the parties, we set forth only those facts relevant to our analysis. In 2010, Suleymanova entered the United States on a visitor's visa and applied for asylum, withholding of removal, and relief under the CAT, claiming that she had been persecuted in the past in Russia and Turkmenistan due to her Lak ethnicity and feared that she would be persecuted, injured or killed if she returned to either country.[1] She concedes that she is otherwise removable for having overstayed her visa.

At a hearing before the IJ, Suleymanova testified that she was born in Turkmenistan in 1984 and lived there until 2002, when she moved with her family to Russia. Suleymanova claimed that, when visiting her grandmother in Moscow in the summer of 1999, she was subjected to persecution due to her Lak ethnicity. In one incident, she was chased on foot by two men whom she described as "skinheads," who accosted and taunted her; she was not, however, physically injured. In another incident, she was walking on a sidewalk when a car followed her and then drove up onto the sidewalk and struck her, forcing her into the wall of a building and causing her serious injuries, which were confirmed by hospital records. Suleymanova believed the men in the car to be "skinheads" who targeted her because of her ethnicity. She also testified

_____

[1] We note that Suleymanova initially applied for asylum from Turkmenistan and Russia but stated before both the BIA and this Court that she no longer sought asylum from Turkmenistan. We note as well that she has not pressed before us the denial of her claims for withholding of removal and CAT relief, and so we do not address those claims.

that they looked at her "aggressively" and that they said something she could not hear. Suleymanova testified that the police came to the hospital and told her that this was not an isolated occurrence, and that a few people of Asian Caucasus appearance also claimed to have been hit by vehicles. In support of her application, Suleymanova submitted a letter from her mother that discussed the vehicle attack and stated that the police had also told her that this was not the first incident of skinheads attacking non-Russians.

Suleymanova testified that, while she lived with her family in Russia from 2002 to 2010, she was harassed due to her ethnicity and could not pursue work or education. She stated that she feared leaving the house from 2002 to 2010, although she traveled to China, in 2008, and the Czech Republic, in 2009, to seek treatment for headaches. She returned to Russia after both trips.

On June 8, 2011, the IJ denied Suleymanova's application, finding that she failed to demonstrate past persecution or a well-founded fear of future persecution. While the IJ found Suleymanova to be generally credible, he concluded that the first incident where she was chased on foot by "skinheads" did not rise to the level of persecution, and that there was insufficient evidence to establish that the vehicle attack, even if intentional, was motivated by her ethnicity. The IJ also concluded that there was a lack of corroboration regarding the discrimination faced by Suleymanova and her family while living in Russia, as well as a lack of evidence corroborating her testimony that from 2002 to 2010 she was housebound, could not find employment, and could not further her education due to her ethnic background. With respect to a fear of future persecution, the

3

IJ found that while there was evidence of a rise of nationalist violence in Russia and discrimination against those perceived to be from the Caucasus or Central Asia, the documentation did not support a determination of systemic, pervasive, or organized harm. The IJ noted that Suleymanova voluntarily returned to Russia from China and the Czech Republic in 2008 and 2009, and that she failed to demonstrate why she could not return to the Smolensk region of Russia, where her family resides, or to Dagestan, the area of Russia containing the largest number of Laks.[2]

On January 23, 2013, the BIA affirmed the decision of the IJ and dismissed Suleymanova's appeal. The BIA found no clear error in the IJ's finding that the first incident in Russia did not rise to the level of persecution, and no clear error in the IJ's finding that the vehicle attack was not shown to be motivated by Suleymanova's ethnicity. The BIA agreed that Suleymanova presented insufficient evidence to demonstrate an objectively reasonable fear of future persecution in Russia. Finally, the BIA found no error in the IJ's conclusion that Suleymanova could safely relocate within Russia to the Smolensk region or Dagestan. Suleymanova now petitions for review.

II.

We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1). Generally, when the BIA issues an opinion we review that decision as the final agency decision. Sarango v. Att'y Gen., 651 F.3d 380, 383 (3d Cir. 2011). Here, because the BIA's decision "both adopts

---

[2] We note that the IJ erroneously stated that Suleymanova failed to provide evidence documenting her ethnicity. Because, however, the IJ proceeded on the assumption that Suleymanova was perceived to be from the Caucasus, which could subject her to discrimination in Russia, we agree with the BIA that this constituted harmless error.

the findings of the IJ and discusses some of the bases for the IJ's decision," however, "we have authority to review the decisions of both the IJ and the BIA." Chen v. Ashcroft, 376 F.3d 215, 222 (3d Cir. 2004).

We review for substantial evidence, which requires us to examine the IJ's and the BIA's findings to determine whether they are "supported by evidence that a reasonable mind would find adequate." Dia v. Ashcroft, 353 F.3d 228, 249 (3d Cir. 2003) (en banc). We may reverse a finding only when "no reasonable fact finder could make that finding on the administrative record." Id. In other words, "to obtain judicial reversal of the BIA's determination, [the applicant] must show that the evidence he [or she] presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." INS v. Elias-Zacarias, 502 U.S. 478, 483-84 (1992).

To prevail on an asylum claim, an alien must demonstrate an unwillingness or inability to return to his or her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Pursuant to the REAL ID Act, which applies to applications filed after May 11, 2005, the burden of proof is on the applicant to "establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added). While the applicant's testimony may be sufficient to sustain this burden of proof without corroboration, "[w]here the trier of fact determines that the applicant should provide evidence that

5

corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence." 8 U.S.C. § 1158(b)(1)(B)(ii).

To establish a well-founded fear of future persecution, "the alien must show both a subjective fear and that a reasonable person in his position would fear persecution, either because he would be individually singled out for persecution or because there is a pattern or practice in his home country of persecution against a group of which he is a member." Khan v. Att'y Gen., 691 F.3d 488, 496 (3d Cir. 2012) (internal quotation marks omitted). The source of the persecution must be "the government or forces that the government is unwilling or unable to control." Id.

### III.

As an initial matter, Suleymanova invokes Abdulai v. Ashcroft, 239 F.3d 542, 554 (3d Cir. 2001), and argues that the IJ erred with reference to the need for corroboration of her testimony. In Abdulai, we held that when considering the need for corroboration, the IJ should (1) identify what particular aspects of the applicant's testimony it would be reasonable to expect be corroborated, (2) explain why the evidence applicant submitted failed to do so, and (3) state why the applicant's explanations for that failure were insufficient. Abdulai, 239 F.3d at 545. The IJ must "give the applicant notice of what aspects of the applicant's testimony need corroboration," and must offer the applicant an opportunity to explain why he or she cannot produce the corroborating evidence. Sandie v. Att'y Gen., 562 F.3d 246, 253 (3d Cir. 2009).

6

Here, the IJ cited Abdulai and "adequately worked through the three-part Abdulai inquiry" by identifying the facts for which he sought corroboration, analyzing the information that was provided, and considering whether or not Suleymanova adequately explained her failure to provide additional evidence. See Sandie, 562 F.3d at 253. Significantly, Suleymanova does not argue that the IJ failed to provide her with an opportunity to present the corroborating documents he requested, that the IJ failed to give her notice of the fact that she would need to corroborate her testimony, or that the IJ failed to offer her an opportunity to explain why she did not provide the requested corroborating documents. Instead, she argues that the IJ should have concluded that the corroborating evidence she did provide was adequate to sustain her burden of proof. For the reasons discussed below, however, a reasonable fact finder could conclude that Suleymanova failed to carry her burden of proof to establish eligibility for asylum, and we turn to that.

First, we agree with the IJ and BIA that the incident in which Suleymanova was chased by "skinheads" did not rise to the level of persecution. As we have held, "brief detentions, where little or no physical harm occurs, generally do not rise to the level of persecution." Gomez-Zuluaga v. Att'y Gen., 527 F.3d 330, 342 (3d Cir. 2008) (holding that being twice rounded up by armed men at gunpoint and warned not to fraternize with government officers did not rise to the level of persecution, as the detentions were brief and petitioner was not physically injured or robbed).

Second, we agree with the IJ and BIA that Suleymanova failed to provide

7

sufficient evidence to establish that the vehicle attack was motivated by her ethnicity. Applicants for asylum bear the burden of providing evidence, direct or circumstantial, that persecution was based on a statutorily protected ground. Ndayshimiye v. Att'y Gen., 557 F.3d 124, 131 (3d Cir. 2009). The IJ and BIA took into consideration Suleymanova's testimony regarding her observations of the men in the car, her testimony that they looked "aggressively" at her, her testimony that she heard them say some unintelligible words, and her testimony and her mother's letter indicating that the police told them that similar attacks by skinheads had occurred.[3] This evidence, even when taken together with evidence of the country conditions and Suleymanova's other allegations of harassment, does not compel a finding that the attack was motivated by her ethnicity.

Indeed, as the IJ observed, even assuming Suleymanova was struck intentionally, any number of reasons could have provoked the attack, including random violence. In her brief to this Court, Suleymanova herself recognizes that "it is not impossible that the skinheads were involved in a random act of violence" when they attacked her. (Pet'r Br. at 17.) As we have found, "ordinary criminal activity does not rise to the level of persecution necessary to establish eligibility for asylum." Abdille v. Ashcroft, 242 F.3d 477, 494 (3d Cir. 2001); see also Lie v. Ashcroft, 396 F.3d 530, 535 (3d Cir. 2005)

---

[3] Suleymanova contends that the IJ erred by failing to take into consideration the letter from her mother which corroborated her claim that the police stated that the vehicle attack was not an isolated incident. Although we agree that the IJ appears to have overlooked this letter, the BIA explicitly considered the letter and found it wanting in that it provided only generalized and second-hand corroboration.

(affirming BIA decision that use of a "single ethnic slur" during a robbery was insufficient to establish that the persecutors were motivated by the victims' ethnicity). For example, in Abdille, petitioner presented evidence of "a generalized climate of hostility in South Africa toward African refugees and foreign street vendors," but no evidence that the two attacks he experienced "were not mere acts of random lawlessness, but rather were perpetrated on account of his race, nationality, or membership in a particular social group." Abdille, 242 F.3d at 495. We held that "[s]uch tenuous evidence may support an inference that the assaults [petitioner] suffered rose to the level of persecution, but it does not compel such a conclusion. Accordingly, given our deferential review, the BIA's decision as to past persecution must stand." Id. Similarly, here, because the evidence does not compel a conclusion that the vehicle attack constituted past persecution, we must uphold the BIA's decision.

A reasonable fact finder could also conclude that Suleymanova failed to establish a well-founded fear of future persecution in Russia. As the IJ and the BIA concluded, the evidence of country conditions in Russia, which referred to an "increase" in violence against individuals perceived to be from the Caucasus, reflected random acts of violence rather than systemic or pervasive persecution. In addition, Suleymanova twice returned voluntarily to Russia in 2008 and 2009, and her family continues to reside there. These facts undermine her claimed fear of future persecution. See Jean v. Gonzales, 461 F.3d 87, 91 (1st Cir. 2006) (petitioner's "willingness to return voluntarily to Haiti on multiple occasions undermines the contention that [petitioner] experienced persecution and has a

9

well-founded fear of persecution there"); <u>Lie</u>, 396 F.3d at 357 (holding that "when family members remain in petitioner's native country without meeting harm, and there is no individualized showing that petitioner would be singled out for persecution, the reasonableness of a petitioner's well-founded fear of future persecution is diminished").

## IV.

We will deny the petition for review.